**HARBOR TUG & BARGE, INC., a corporation, Plaintiff-Appellee,**

v.

**BELCHER TOWING COMPANY, Defendant-Appellant.**

**BELCHER TOWING COMPANY, Third Party Plaintiff-Appellant,**

v.

**Carl N. BROWN, Third Party Defendant-Appellee.**

No. 82–5729.

United States Court of Appeals, Eleventh Circuit.

June 4, 1984.

William G. Cooper, Jacksonville, Fla., for defendant-appellant.

Gary A. Bubb, Jacksonville, Fla., W.B. Ewers, Fort Lauderdale, Fla., for plaintiff-appellee.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

SIMPSON, Senior Circuit Judge:

On April 15, 1979, the barge *San Juan* crashed into a concrete bulkhead while attempting to dock in the Port of Miami, Florida. Harbor Tug and Barge, Inc., the barge owner, sued the tug operator, Belcher Towing Company, in personam. Belcher, in turn, named Captain Carl N. Brown, the local pilot who planned and directed the docking operation, as a third party defendant. After hearing a day and a half of testimony and receiving into evidence documents and transcribed depositions, the district court issued the opinion attached as an appendix. The facts appear sufficiently

from the district court's opinion. Belcher appeals the accompanying judgment. Though it admits some negligence on its part, it contests the holding that it was liable for seventy-five percent of the damages.[1]

A judgment of a trial court, sitting without a jury in admiralty, may not be set aside unless it is clearly erroneous. *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954). This limitation on review extends to all findings of fact including the apportionment of damages. *Gele v. Wilson*, 616 F.2d 146 (5th Cir.1980); *Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044 (5th Cir. 1981).[2]

Belcher's first argument is that the court erred in failing to divide damages equally among the three parties because no fair measurement of comparative fault was possible. In adopting the law of comparative negligence the Supreme Court stated:

> An equal division of damages is a reasonably satisfactory result only where each vessel's fault is approximately equal and each vessel thus assumes a share of the collision damages in proportion to its share of the blame or where comparative degrees of fault cannot be measured and determined on a rough basis.

*United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). We find that sufficient evidence to sustain the implicit finding that there were sufficient differences in the parties' circumstances so as to allow a rough comparison of their relative culpability was presented to the district court and is recited in its opinion.

Belcher's second argument is that the district court committed legal error in apportioning damages on the basis of *cause* contrary to the holding in *Reliable Trans-*

*fer* that "damage is to be allocated among the parties proportionately to the degree of their *fault*". 421 U.S. at 411, 95 S.Ct. at 1716. [emphasis supplied]. In support of this argument, Belcher cites *Gele v. Wilson*, supra. In that case, a wrongful death action, decedent was a passenger in a motor boat traveling at a speed excessive for the night-time conditions. The fatal injury occurred when the boat struck a dark flare pipe that defendant Chevron Oil Company had failed to mark with a light or reflectors as required by Department of Transportation regulations. The trial judge found Herr, the operator of the boat, liable for twenty percent of the damages and Chevron liable for the remaining eighty percent. On appeal, Chevron challenged the apportionment of damages. The former Fifth Circuit examined the circumstances surrounding the negligence of each defendant and affirmed the apportionment. Herr could see dark objects about one hundred yards ahead and light sources at a distance of five or six miles. The boat was capable of stopping within seventy-five feet. Unless the boat was traveling at a speed near that at which it was driven at the time of the collision, its bow would rise slightly and thereby obscure the operator's forward vision. Herr's actions were found "regrettable in retrospect", but not "totally devoid of reason". Chevron's failure to mark the pipe was unexplained.

"The violation of a safety provision designed to prevent collisions has always been viewed harshly in admiralty. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874) (imposing on one shown to have violated such a rule the burden of proving that its fault "could not have been" one of the causes of the collision).

The respective transgressions of Herr and Chevron may have been equally responsible for the collision. Liability however, "is to be allocated among the par-

---

1. In an appellee's brief, Brown argues the judge committed clear error in finding him negligent. Because he failed to perfect an appeal, we do not address this argument or appellant's counter argument. *United States v. Railway Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 563, 68 L.Ed.

1087 (1924); *Campbell v. Wainwright*, 726 F.2d 702, 704 (11th Cir.1984).

2. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

ties proportionately to the degree of their fault," not according to their degree of causation. . . .

". . . Herr's fault lay solely in maintaining an immoderate speed; there is no indication that he failed to keep a proper look or was otherwise inattentive to his duties. In light of Chevron's unexcused dereliction of an express statutory duty, we cannot say that the trial court's allocation of fault in this case was clearly erroneous."

*Gele v. Wilson*, 616 F.2d at 148.

■ We do not interpret *Gele* as requiring a trier of fact to disregard all issues of causation and apportion on the basis of abstract fault. Fault which produces liability must be a contributing or proximate cause of the collision. *Tringali Bros. v. United States*, 630 F.2d 1089, 1090 (5th Cir.1980), *Valley Towing Service, Inc. v. S.S. American Wheat*, 618 F.2d 341 (5th Cir.1980); *Board of Commissioners v. M/V Farmsum*, 574 F.2d 289, 297 (5th Cir.1978); See also *Hess Tankship Co. v. Allied Chemical Corp.*, 526 F.Supp. 1333, 1346 (E.D.La.1979) aff'd 661 F.2d 1044, 1052 (5th Cir.1980). Neither do we agree with Belcher's assertion that the district court deviated from fault-based analysis merely because its opinion states that "The main cause of the accident . . . was Belcher supplying an underpowered tug without disclosing its failing." The evidence presented and the preceding recital of facts must be considered in placing the phrase in its proper context. We interpret "main cause" as a shorthand reference to the fact that Brown relied upon his experience in working with Belcher tugs in formulating the docking plan and Harbor Tug relied upon Brown's expertise and familiarity with the harbor and the equipment Belcher provided. Belcher's failure to inform the other parties that the *Edwin Belcher* could not deliver full power necessarily clouded their judgment. The inherent risks in the docking plan would be more easily perceived by and seem more serious to anyone who knew that one tug could not perform as could be reasonably expected.

Though we would prefer the comparison of fault in more direct language, we are more concerned with the substance of the opinion than "beating around the semantical bush," see, *Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.*, 565 F.2d 1129, 1139 (9th Cir.1977). We find no departure from the standards of apportionment set forth in *Reliable Transfer*, supra.

■ Belcher's third argument is that the judge failed to assign fault to Harbor Tug and Brown for attempting to dock the *San Juan* without the aid of a seagoing tug, for failing to anticipate the effect that current and a dragging tow chain would, and did, have on the docking operation and in failing to abort the maneuver prior to the allision. In addition, Belcher alleges that it should be relieved of liability because Brown's negligence "actually [sic] hindered" the tugs from meeting their duty of workmanlike performance, citing *Compagnie Generale Transatlantique v. United States*, 522 F.2d 148 (2d Cir.1975).

Belcher's argument necessarily assumes Brown knew that the *Edwin Belcher* was unable to deliver full power. At trial, Brown testified that he first became aware of the engine trouble when the *San Juan* was in a difficult situation and the tug was unable to move the barge as expected. Belcher tried to impeach Brown by introducing a log entry made by its dispatcher before Belcher tugs attempted the tow:

Captain request (sic) Smith instead of E.N.B. Because Smith has more power than Edwin now. Right engine on E.N.B. won't run up high now.

Though Belcher opines that "it is almost inconceivable that the dispatcher was referring to anyone other than Captain Brown", the trial judge did not so find. Belcher never called the dispatcher as a witness but relied instead on another employee to interpret the entry. We find no grounds for overturning this credibility choice. Nor do we find clear error in failing to find additional fault on the part of Brown or Harbor Tug. "The determination of negligence is ordinarily within the province of the trier of fact because of the peculiarly elusive nature of negligence and the necessity that the trier of fact assess the reasonableness

of the conduct under all the circumstances." *Decker v. Gibson Products of Albany, Inc.*, 679 F.2d 212, 216 (11th Cir.1982).

Belcher raises two final issues on appeal each of which, it admits, presents insufficient grounds for reversal. Belcher argues, however, that these issues are sufficient indicia of prejudice by the trial judge to overcome any presumption that the opinion below was the correct result of fair proceedings before an impartial trier of fact and requests that the court consider the cumulative effect of all error argued in the brief and grant a new trial to assure fundamental fairness.

■■■■ Belcher complains of a failure to grant a continuance to allow it to produce a witness who had failed to honor a subpoena on the last day of trial. The witness, Ollie Dan Taylor, had testified for Harbor Tug on the previous day and had been extensively cross-examined by both defendants. When Belcher requested a continuance, the judge inquired what further testimony Belcher needed from Taylor. When pressed, Belcher's counsel replied that they wished to elicit Taylor's negative opinion of Brown's plan to use a hawser to tow the *San Juan* into the slip but added, "... [T]hat's in his deposition." The court, having previously admitted the deposition into evidence, denied a continuance. Belcher attempts to show prejudice by suggesting that the trial court failed to read the deposition because the judge stated during closing arguments that he saw no negligence on the part of Brown. The final opinion itself belies the speculation; Brown was ultimately found negligent.[3] We find no error in denying a continuance for the sole purpose of introducing cumulative evidence. *Lirette v. Popich Bros. Water Transport Inc.*, 660 F.2d 142, 145 (5th Cir. 1981); Fed.R.Evid. 403.

■■■■ The final attack addresses the judge's verbal participation in the trial. At the close of Harbor Tug's case in chief, the

court ruled, sua sponte, that the evidence presented was sufficient to overcome a motion to dismiss. When Belcher asked Brown whether he would again try the maneuver with fully powered tugs now that he knows the results of the original attempt, the judge commented that such speculation was of little probative value due to its reliance on "20–15" hindsight. During closing arguments, the judge revealed his preliminary view of the case and discussed with counsel certain weaknesses in Belcher's proof of Brown's negligence. Belcher points to these incidents as evidence that the trial judge was biased. We find no merit in this assertion. The trial judge sat as the trier of fact. In that capacity, he not only enjoyed the traditional privilege of commenting on the evidence and factual issues accorded the judge in a federal jury trial, see e.g. *Trezza v. Dame*, 370 F.2d 1006, 1008 (5th Cir.1967), but also he had considerable latitude in expediting the presentation of evidence and fully exploring the legal issues in the case during oral argument without danger of undue influence.[4] We find no evidence of prejudice in the record. Accordingly, the judgment of the district court is

AFFIRMED.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA JACKSONVILLE DIVISION

No. 79–739–Civ–J–M

HARBOR TUG & BARGE, INC., a corporation, Plaintiff,

vs.

BELCHER TOWING COMPANY, Defendant.

## MEMORANDUM OPINION

Harbor Tug and Barge, Inc., invoking this court's maritime jurisdiction, has sued

---

**3.** The trial judge was not bound by his off-hand remarks. In its search for error, the reviewing court looks to the formal findings and conclusions contained in the written opinion. *Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, n. 2 (5th Cir.1961).

**4.** Cf. *Newman v. A.E. Staley Mfg. Co.*, 648 F.2d 330 (5th Cir.1981) (clear error found because jury could have concluded that the trial judge favored plaintiff's position).

Belcher Towing Company for damage Harbor Tug's barge, the *San Juan*, suffered when it crashed into a dock while being docked with Belcher Towing Company's tugboats in the Port of Miami, Florida. As allowed by Federal Rule of Civil Procedure 14(c), Belcher sued the pilot in charge of the docking operation, Carl N. Brown, in a third-party action. Once all players were in the lawsuit, they began pointing fingers at each other. Harbor Tug claims Belcher's negligence caused the accident. Belcher says Harbor Tug's and Brown's negligence caused the accident. And Brown says Harbor Tug and Belcher are responsible. I find Harbor Tug is 25% responsible for the accident and Belcher is 75% responsible. Captain Brown has no liability.

The accident occurred April 15, 1979, while Harbor Tug's barge, the *San Juan*, was being docked in the Albury Slip in the Port of Miami. Earlier in April Captain Ollie Dan Taylor, assistant port captain for Harbor Tug, called Belcher Towing's dispatcher to arrange for tugboats to dock the *San Juan*. He told the dispatcher Harbor Tug's seagoing tug, the *Patriarch*, was bringing two barges to the port and would need help docking one. Taylor informed the dispatcher the *San Juan*, a double-deck barge, was the one they wanted to dock and that Harbor Tug did not want to use the *Patriarch* for the docking. Leaving the *Patriarch* at sea was a cost-saving measure. The dispatcher told Taylor Harbor Tug must use a "harbor pilot" if it were not using one of its tugs in the docking. Taylor said he preferred to pilot the docking operation himself, but the dispatcher insisted upon a "harbor pilot." "Harbor pilot" meant a member of the Biscayne Bay Pilot's Association.

April 14, 1979, Taylor flew down to Miami for the docking. At the harbor he met Captain William Bunting, Captain of the Belcher Tug *Mary Belcher*, and Captain Carl Brown, the harbor pilot assigned to the operation. In Miami Taylor asked once again if he could supervise the operation. Belcher's dispatcher once again told him a

harbor pilot must be used if one of Harbor Tug's boats would not be used.

Brown, Taylor, and Bunting all boarded the *Mary Belcher* and rode it out to rendezvous with the *Patriarch* and the *San Juan* offshore. En route they discussed the docking procedure. All three were concerned because the *San Juan* was a large, unwieldy double-deck barge, 100 feet by 400 feet. None of them had ever been involved in docking a double-deck barge without using a seagoing tug. Captain Bunting was particularly concerned. He knew his boat did not have a winch capable of taking in the heavy chain bridle used to tow the *San Juan*.

The bridle was attached to the sides of the barge's bow. It had two legs 90 feet long, one leg attached to each side of the bow. Another length of chain, approximately 40 feet long, was attached to the other ends of the chain. When the towing vessel and the barge were close together the chain hung down into the water as much as 35 feet below the surface. The chain hanging down, Bunting warned, would make him unable to control the barge. At best he felt he could only hold the barge, and the weight of the chain could well pull the barge around.

Brown was aware of these problems and discussed them with Taylor and Bunting. He proposed a plan he felt would work using the *Mary Belcher* and two other tugs. His idea was to tow the barge up alongside the slip's entrance with the *Mary Belcher* and then use the other two tugs to pull the barge stern first into the slip while the *Mary Belcher* held and steadied it. All parties acknowledged the operation would be risky but agreed to try Brown's proposed procedure.

When the *Mary Belcher* reached the *Patriarch* and its charges, the *San Juan* was disconnected from the *Patriarch* and tethered to the *Mary Belcher*. Captain Taylor was in charge of the transfer.

The *Mary Belcher* brought the barge uneventfully up the channel to the Albury Slip. When the vessels drew close to the slip the *W.C. Smith* and *Edwin Belcher*,

which had been dispatched by *Belcher,* joined to assist with the docking. The dispatcher knew one of the *Edwin Belcher's* engines was failing. He did not inform Captain Brown of this problem. Captain Brown boarded the *San Juan* to direct the docking. Captain Taylor also boarded the *San Juan,* but only as an observer.

The docking maneuver began as planned. The *Mary Belcher* pulled the *San Juan* past the slip in a position where the barge was parallel to the terminal and almost perpendicular to the slip with its stern positioned in front of the slip's mouth. The terminal was on the *San Juan's* starboard side. The *W.C. Smith* had a line attached to the stern of the barge on the port side. The *Edwin Belcher* had a line attached to the barge on the port side toward the bow. The *Mary Belcher* remained attached to the barge's bow by the heavy chain bridle.

As the *W.C. Smith* began pulling the barge stern first into the slip, the current began pushing the stern away from the slip and toward a Coast Guard cutter docked on the side of the slip opposite from the *San Juan's* intended resting place. The barge also began drifting toward the slip's bulkhead. Brown ordered the *Mary Belcher* to pull the barge forward. Knowing the *Mary Belcher* could not have much effect Brown also repeatedly ordered the *Edwin Belcher* to back full which would have moved the barge away from the bulkhead and the cutter. Because of its reduced power the *Edwin Belcher* could not move the barge enough, and it crashed into the corner of the dock, came away from it, and then hit it again. The *Mary Belcher's* inability to affect the barge's drift made the *Edwin Belcher's* task much more difficult. Eventually Captain Brown succeeded in docking the barge by using the corner of the dock as a pivot.

The collisions dented the *San Juan* twice, forward on its starboard side. The dents did not fracture the hull or interfere with the barge's operation, and Harbor Tug used it normally until docking it for many repairs, including the repair of the dents. The cost of repairing the dents was $172,-588. The cost of the survey evaluating the damage caused was $846.

Negligence determines liability for the damage to the *San Juan.* Any party who was negligent is responsible for the damage proximately caused by its negligence. Here, obviously somebody was negligent. Even the parties agree to that. To begin with, in ordinary circumstances absent negligence by some party the barge's docking should have been uneventful. *National Transport Corp. v. Tug Abqaiq,* 418 F.2d 1241 (2d Cir.1969). Belcher says both Brown and Harbor Tug were negligent for undertaking the docking manuever without a seagoing tug. Had Captain Brown simply undertaken the docking without disclosing his plans, Belcher's characterization would be accurate. The testimony shows the manuever was not one a reasonable and prudent man would undertake. It was risky. But Captain Brown disclosed the risks to Harbor Tug, and it accepted the risks. Thus to the extent the collision was due to imprudence or negligence on Captain Brown's part, Harbor Tug assumed that risk. *See, Socony-Vacuum Co. v. Smith,* 305 U.S. 424 [59 S.Ct. 262, 83 L.Ed. 265] [1939]; *The Seeandbee,* 102 F.2d 577 (6th Cir.1939). I find the risks inherent in Captain Brown's plan, specifically the *Mary Belcher's* inability to control the *San Juan,* were 25% responsible for the collision.

The main cause of the accident, however, was Belcher supplying an underpowered tug without disclosing its failing. That was a clear violation of its duty to Harbor Tug. *Stevens v. East-West Towing Co., Inc.,* 656 F.2d [701] (5th Cir.1981). And the inability of the *Edwin Belcher* to perform as it should have was 75% responsible for the collision.

Harbor Tug includes repair costs, damage surveys, transportation costs, and prejudgment interest in the damages it requests. I find only repair costs and the damage surveys were caused by the negligence and resulting collision. The *San Juan* needed repairs and transportation costs would have been incurred even if the

collision had not occurred. Prejudgment interest is generally allowed in admiralty cases. *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724 (5th Cir.1980). There are no equitable reasons to deny pre-judgment interest, and I will award it. In summary, I hold Harbor Tug is entitled to recover from the defendant Belcher the following:

| | |
|---|---:|
| Cost of Repair | $172,588.00 |
| Survey Cost | 846.00 |
| | $173,434.00 |
| Belcher's proportional responsibility | × .75 |
| Total Damages for which Belcher is responsible | $130,075.50 |

In addition to the damages for which Belcher is responsible, Belcher shall also pay Harbor Tug pre-judgment interest of 12% on the damages from April 15, 1979, until the judgment is satisfied.

Belcher shall recover nothing from Captain Brown.

The Clerk shall enter judgment in accordance with this order and assess costs as provided by law.

DONE AND ORDERED this 16th day of May, 1982.

/s/ Lynn C. Higby
LYNN C. HIGBY
UNITED STATES DISTRICT JUDGE