**PELICAN MARINE CARRIERS, INC., Plaintiff,**

v.

**The CITY OF TAMPA, et al., Defendants.**

**No. 90–407–CIV–T–20C.**

United States District Court, M.D. Florida, Tampa Division.

April 14, 1992.

**848**

Edward F. Gerace, Kass, Hodges & Massari, Tampa, Fla., for Pelican Marine Carriers, Inc.

Brooks Pettingill Hoyt, Mark Edwin Grantham, Holland & Knight, Tampa, Fla., for City of Tampa.

Clifford L. Somers, Somers & Associates, Tampa, Fla., for Misener Marine Inc. and Misener Marine Const., Inc.

## ORDER

JENKINS, United States Magistrate Judge.

THIS CAUSE comes on for consideration of a diversity action for damages resulting from an allision involving the American flagged vessel, *Louisiana Brimstone* (*"Louisiana"*), which occurred on the westerly side of Sparkman Channel in Hillsborough County Florida on August 29, 1989. The parties consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed. R.Civ.P. 73.

Summary judgment was granted in favor of defendants on July 30, 1991 on Count I which asserted claims of public and private nuisance and a private cause of action under Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401 *et seq.* (Dkt. 52).

The case proceeded to a non-jury trial on November 25 and 26, 1991 on Count II of the amended complaint which asserted a claim of negligence against the City of Tampa and Misener Marine Construction, Inc. These findings of fact and conclusions of law are submitted pursuant to Rule 52, Fed.R.Civ.P.

### I

### *Findings of Fact*

1. The *Louisiana* is an American flagged tanker-type vessel measuring 612 feet in length and 80 feet in width, and having a gross tonnage of 13,199. The *Louisiana* is owned by the plaintiff, Pelican Marine Carriers, Inc. ("Pelican"), a corporation organized under the laws of Delaware and having its principal office for the transaction of business in a state other than Florida.

2. Defendant Misener Marine Construction, Inc. ("Misener") is a corporation organized under the laws of Florida and doing business in the State of Florida.

3. Defendant City of Tampa ("The City") is a governmental entity organized under the Constitution and laws of the State of Florida.

4. Sparkman Channel, a navigable waterway of the United States, is 400 feet in width and runs generally in a north-south direction. The published depth of the channel is 34 feet at mean low water.

5. In October, 1948, the City applied to the United States Corp of Army Engineers (the Corps) for a permit to construct a 48-inch sewer line under Sparkman Channel from Seddon Island (Harbor Island) to the mainland at Hooker's Point. The permit was granted on November 1, 1949 and incorporates drawings by the City which show the intended construction of the sewer line. The permit has never been amended or altered, and there have been no subsequent permits issued to the City in connection with the sewer line under Sparkman Channel.

6. On August 29, 1989, the *Louisiana* struck a portion of the sewer line which damaged the vessel's hull.

7. The permit for the sewer line issued by the Corps required that the top of the sewer pipe be no greater than forty (40) feet below mean low water for a full channel width of 400 feet and that the sewer

line not constitute an unreasonable interference with navigation.

8. When constructed, however, the sewer line was at a depth of only 34.3 feet below mean low water as it transected the 400 foot channel before starting to rise towards the shoreline. Outside the channel, the slope of the banks and the sewer line was approximately 1:3 (one foot vertical rise for every three feet horizontal distance).

9. In 1958, the sewer line was damaged during a Corps dredging operation to deepen Sparkman Channel. On December 9, 1958, the City requested permission from the Corps to construct a concrete bulkhead on the Seddon Island side of the sewer line to protect the sewer line from future damage.

10. In a letter to the City dated December 18, 1958, the Corps stated that if the sewer line "had been placed in full accordance with the permit dated November 1, 1949, it is probable that no damage [from the dredging operation] would have been encountered." The letter noted the disparity between the pipe elevation specified in the permit—40 feet below mean low water—and as shown by probings by the Corps taken before the dredging operation—34.3 feet below mean low water.

11. The Corps' letter also noted that "concrete boxes may be present at various points along the pipe and that the elevation of these boxes may be even greater than the elevation determined by the probings shown on the attached sheet." The letter warned that the proposed concrete bulkhead would be a "menace to navigation in the sense that any vessel which for any reason veered outside of the strict limits of the channel could well be damaged," and stated that the "best method of protection" would be to lower the sewer line.

12. The City did not lower the sewer line or build the proposed bulk-head but placed a concrete cap at the site of damage to the sewer line from the 1958 accident.

13. In 1982, the sewer line blew a hole at the site of the concrete cap, and the City contracted Misener to repair the cap. Norm Van Pelt, a commercial diver, was

Misener's superintendent in charge of the sewer line repair project.

14. In order to repair the sewer line, Misener first had to visualize the leak by removing ten (10) feet of mud or overburden. The crew then jackhammered concrete from the center of the concrete cap until the leak was exposed. Misener removed as much of the broken concrete as it could because it would have been a hazard to navigation to leave the concrete pieces in the channel.

15. Misener repaired the cap by pumping approximately ten (10) cubic yards of concrete into the structure. Misener did not remove all of the old concrete prior to pumping the new concrete, as the jackhammering did not reach the edges of the original concrete cap.

16. Misener submitted a proposal to the City regarding repair of the sewer line, and the City approved the plan. The City did not provide any directions to Misener regarding the elevation of the repair, nor did the City instruct Misener to place a buoy or any other warning device at the site of the cap.

17. After Misener's repair in 1982, there was approximately three to five feet of concrete over the sewer line at the cap site, and the top of the concrete cap was approximately thirty (30) feet below mean low water level.

18. Misener did not change the dimensions of the concrete cap which the City constructed on the sewer line after the 1958 accident. The cap repaired by Misener did not rise any higher after the repair job done by Misener in 1982 than it did prior to the repair.

19. At the time of the allision, the existence of the sewer line crossing Sparkman Channel was noted on the Corps' survey charts and reports which, according to the Coast Guard, are "available and commonly referenced by the pilots." However, neither the sewer line nor the concrete cap was noted on navigation charts and there was no surface marker marking the area of the cap at the time of the allision involving the *Louisiana.*

20. The pilot of the *Louisiana,* Warwick Cahill, knew of the general location of the sewer line crossing Sparkman Channel from the charts, as well as the fact that a warning sign had existed in the past on Seddon Island. However he did not know about the concrete cap located on top of the sewer line just outside the channel. The master of the ship, Captain Alan Hopkins, was not aware of the existence of the sewer line or cap at the time of the allision.

21. Based on their experience navigating Sparkman Channel, Pilot Cahill and Captain Hopkins had reason to believe that the bottom surface outside the channel was soft mud and did not present a hazard to navigation. It was not uncommon for vessels to leave the channel limits during docking maneuvers in the turning basin and other areas.

22. Both Pilot Cahill and Captain Hopkins held valid First Class Pilot's Certificates for Tampa Bay issued by the United States Coast Guard.

23. On August 29, 1989, the *Louisiana* was navigating Sparkman Channel and headed for Freeport Sulphur dock located on the east side of the channel. The *Louisiana* was loaded with a cargo of liquid sulphur to a mean draft of 33 feet, 6 inches.

24. There were no adverse weather conditions limiting visibility or navigation.

25. Both pilot and master were participating in the management of the vessel.

26. The usual docking approach of the *Louisiana* was to turn the vessel in an area off of the Tampa Shipyards and back her into the Freeport dock so that the vessel would be portside to berth.

27. On August 29, 1989, Pilot Cahill and Captain Hopkins used a different docking approach due to recent shoaling in the area. Captain Hopkins had used this approach on one prior occasion. The *Louisiana* proceeded north up Sparkman Channel to the Ybor City Turning Basin, turned south and headed back to the Freeport berth, approaching bow first instead.

28. This approach required that the *Louisiana* pass the *Pennsylvania Trader,* a petroleum tanker docked just north of the Freeport Sulphur dock. In order to pass the *Pennsylvania,* the *Louisiana* was required to veer to the west of the channel centerline.

29. As the *Louisiana* exited the turning basin, the tugs YVONNE and EDNA were accompanying her with slack lines. Engine speed was half a head leaving the basin at 1531 hours. At 1533 hours the *Louisiana* put her engine slow ahead. At 1538 hours the *Louisiana* put her engine dead slow ahead to approach and pass PENNSYLVANIA TRADER. At 1540 hours the *Louisiana* stopped her engine.

30. As the *Louisiana* lost headway, YVONNE was ordered to push the bow to port i.e. to the east or away from Seddon Island and toward Hooker's Point. This was the first order to either tug since the *Louisiana* exited the turning basin. At 1541-½ hours the *Louisiana* put her engine half astern while YVONNE continued to push. Following the half astern engine order at 1541-½ hours, the bow of the *Louisiana* moved strongly to starboard, to the west of the channel and the stern moved to port. At 1542 hours the *Louisiana* stopped her engine and at 1542-½ hours came full ahead with her rudder hard left. This stopped the movement of the bow to starboard and the stern to port.

31. At 1543 hours the *Louisiana* stopped her engine. At 1544 hours she put her engine half astern and at 1545 hours full astern. The bow again moved to starboard, with the stern again moving to port. YVONNE was still pushing and EDNA was ordered to back full. At 1546 hours the *Louisiana* put her engine full ahead and her rudder hard left to stop the movement of the bow to starboard and the stern to port. At 1546-½ hours the *Louisiana* stopped her engine and put her rudder hard right to keep her stern away from the Seddon Island side of the channel. The EDNA was ordered to stop and let go.

32. The *Louisiana* was traveling at a speed of 3 knots or more on its approach to the Freeport Sulphur dock from the Ybor City Turning Basin. Due to the torque caused by the bottoming effects and the

excessive speed, directional control over the vessel was lost. This speed was excessive under the circumstances, especially due to the *Louisiana's* close proximity to the *Pennsylvania Trader* and the berth.

33. The Coast Guard investigation report concluded that the *Louisiana* was proceeding at an excessive rate of speed:

> The apparent cause of the grounding was loss of control of the vessel during its approach to dock. The primary contributing factor was excessive speed of the vessel (in excess of 2 knots) in the narrow channel.

(Defendant Misener's Exhibit 2)

34. At approximately 1548, the *Louisiana* collided with a submerged object which was an edge of the concrete cap on the City's sewer line approximately five (5) feet outside Sparkman Channel and to the west of the Freeport Sulphur dock. Although the vessel was taking on water from the hull damage, it was able to regain directional control and dock without further incident. The cargo was not damaged.

35. At the time of the allision, channel conditions were one foot over mean low water.

36. Russell Younkin of International Ship Repair, a commercial diver for approximately fifteen years, dove in the area of the allision several days later. He was familiar with the site because in 1982 he assisted in locating the sewer leak.

37. Mr. Younkin located the concrete cap which was covered by a thin layer of mud except for a portion near the channel side which was exposed. He retrieved several small pieces of concrete and paint chips and gave these items to the *Louisiana's* Port Engineer, Red Williamson.

38. At the time of the allision the layer of mud covering the sewer line and part of the cap was not solid and was easily penetrated by a probe. The mud layer did not prevent the cap from being an obstruction to navigation.

39. On a subsequent dive for a surveying company, Mr. Younkin marked the location of the cap with a floating buoy. This measure was recommended by the Coast Guard in its investigative report.

40. The officer in charge of the Coast Guard investigation of the allision noted that "[a]s best as can be determined, the presence of a hard rock area at channel edge was not known by the Tampa Bay Pilot's Association." This finding is reflected in a handwritten note to the file dated October 19, 1989, which is part of Defendant Misener's Exhibit 2.

41. The paint chips retrieved by Mr. Younkin were from the *Louisiana*. The *Louisiana* also had concrete marks on its hull.

42. The concrete retrieved by Mr. Younkin was not the same concrete that Misener used for its repair in 1982, since it contained "aggregate" or gravel material which was not utilized by Misener to repair the cap. However, the jackhammering done by Misener to remove portions of the old repair did not reach the edges of the structure and not all of the original concrete comprising the cap was removed.

43. The concrete object which the *Louisiana* struck on August 29, 1989 was a portion of the concrete cap on the sewer line owned by the City, most likely a protruding edge of the old cap which had been constructed by the City on the sewer line in 1958. (Plaintiff's Exhibits 5 and 33)

44. After the allision, the *Louisiana* was drydocked at the Tampa Shipyards. Repairs commenced on August 30, 1989 and the vessel left drydock on September 16, 1989.

45. *The Louisiana* was billed and paid $449,550 for drydocking costs and repairs. Of that amount, the sum of $432,557 is claimed by plaintiff as damages caused by the allision. Since the vessel was about due for drydocking, certain repairs were made which were unrelated to the casualty and those expenses are not claimed.

46. The most significant repair cost resulted from labor and materials to renew the bottom steel plating on the starboard side of the vessel damaged by the grounding: $209,826 for labor and materials and $120,539 for overtime.

47. Overtime was billed at a rate of sixty-seven percent (67%) over straight-time rather than fifty-percent (50%) over straight-time which is the normal and customary overtime rate charged by shipyards in the Tampa area, according to the City's expert witness, Charles Harden. Had the lower and customary rate been used, overtime would have been reduced by $37,211 to $120,539.

48. During drydocking, the shipyard also replaced the seal on the stern tube after detecting an oil leak. The charge for this repair was $3,500.

49. During the final maneuvers before the allision, the engines were reversed. Because of the proximity to the bottom, it was reasonable and prudent to remove the seals to inspect for damage or sand and mud infiltration to the stern tube. This repair was necessitated by the allision and was not an unrelated expense.

50. The reasonable cost of repair attributable to the allision on August 29, 1989, including drydocking, is $395,346.

51. In addition to repair costs, plaintiff claims additional out-of-pocket expenses due to the allision:

| | | |
|---|---|---:|
| (a) | Pilotage from terminal to shipyard. | $ 360.00 |
| (b) | Tug service from terminal to shipyard. | 1,795.00 |
| (c) | Services of ship engineer, Williamson | 5,406.00 |
| (d) | Inspections and reports | 3,205.31 |
| (e) | Inspection at drydocking | 669.61 |
| (f) | American Bureau of Shipping inspections | 4,795.00 |
| (g) | Management fee | 6,527.34 |
| (h) | Crew wages and repatriation | 11,662.17 |
| (i) | Insurance | 22,836.27 |
| | Total | $57,256.70 |

52. Of this amount claimed by plaintiff, the insurance ($22,836.27) and the management fee ($6,527.34) would have been incurred by plaintiff even if the vessel had not been damaged and these expenses, which total $29,363.61, are not reasonably related to the casualty.

53. However, the salary of the ship engineer—$5,406.00—is related to the casualty because the ship engineer had to oversee the repairs to insure that they were properly made by the shipyard even though this expense may have been incurred by plaintiff in any event.

## II

### *Conclusions of Law*

A. Liability of the *Louisiana*

■ 1. In admiralty law, there is a presumption of fault against a moving vessel that strikes a stationary object. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 794 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978). "This presumption requires the moving vessel to show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of an inevitable accident." *Id.* at 795.

■ 2. However, the presumption does not apply to allisions with sunken or hidden objects. *Delta Transload, Inc. v. Motor Vessel "Navios Commander"*, 818 F.2d 445, 450 (5th Cir.1987). Therefore, the party who is invoking the presumption has the burden of proving either that the object was visible or that the vessel otherwise possessed knowledge of the object's location. *Id.* at 450. Where those operating the vessel had knowledge of an otherwise nonvisible object at the time of the allision, this knowledge warrants the imposition of the presumption of negligence against them. *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1471 (5th Cir.1991).

■ 3. Pilot Cahill, the operator of the *Louisiana* at the time of the allision, was aware a sewer line crossed Sparkman Channel and its general location. However, he did not know its depth or know about the concrete cap on the sewer line which protruded above at a height of three to five feet.

4. Captain Hopkins did not know about the sewer line or the cap. Defendants have therefore failed to establish a presumption of negligence on the part of the *Louisiana* for striking a stationary object because it was submerged and unknown to the vessel.

■ 5. Liability must also be addressed under the doctrine set forth in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). *The Pennsylvania* rule states: "[w]hen ... a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probable was not, but that it could not have been." *Id.* at 136.

6. This rule serves to allocate the burden of proof for showing causation by transferring it to the party in violation of a statute or regulation intended to prevent collisions. However, it does not determine a party's ultimate share of liability for damages. *Pennzoil Producing Co.*, 943 F.2d at 1472.

■ 7. The *Pennsylvania* rule applies to allisions between a vessel and a stationary object. *Orange Beach Water, Sewer and Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1381 (11th Cir.1982).

■ 8. The burden of showing that the statutory violation could not have been the cause of the accident is strict, but it is not insurmountable. *Id.* at 1381. It does not require that the violator establish "that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote." (citations omitted). *Ibid.*

■ 9. Rule 6 of the Inland Rules provides that a vessel has a duty to "proceed at a safe speed so that she can take proper and effective action to avoid colli-

sion and be stopped within a distance appropriate to the prevailing circumstances and conditions." 33 U.S.C. § 2006.[1] Further, a pilot has an obligation to proceed at a safe speed under the present conditions. *See Pennzoil Producing Co.*, 943 F.2d at 1470. As set forth in the findings of fact above, the *Louisiana* was travelling at an excessive rate of speed given the conditions and purpose of the docking maneuver and the *Louisiana's* close proximity to the *Pennsylvania Trader*.

10. In the present case, plaintiff has failed to overcome its burden under the *Pennsylvania* rule of establishing that the fault of the *Louisiana* could not have been one of the causes of the accident. On the contrary, the vessel's excessive speed was a primary cause of the allision. Therefore, the *Louisiana* is partially at fault in this allision.

**B. Liability of the City**

■ 11. 33 U.S.C. § 403 prohibits obstructions in navigable waters of the United States.[2] "The duty not to create an obstruction to navigation extends to the entire width of a navigable waterway, and is not limited to the dredged channel." *M/V Alva*, 680 F.2d at 1382. The duty imposed by Section 403 is also breached where a structure not initially an obstruction to navigation becomes one because of improper maintenance. *Id.* at 1383. Also, it is immaterial whether a submerged structure is covered by soft mud. Navigable waters include the muds along the shore through which vessels are capable of running. *Id.* at 1383 n. 8.

■ 12. In this case, the permit of the Corps required the City's sewer line to be at a depth of forty (40) feet below mean water level as it transited Sparkman Channel, a navigable waterway. In fact, the

---

**1.** The Inland Rules apply to all vessels upon the inland waters of the United States. 33 U.S.C. § 2001(a). *See also Hercules Carriers, Inc. v. Claimant State of Florida, Department of Transportation*, 768 F.2d 1558, 1566–1568 (11th Cir. 1985) (applying Rule 6 of the Inland Rules to determine whether a vessel's speed caused an allision with a bridge in Tampa Bay pursuant to *The Pennsylvania* rule).

**2.** This statute provides, in part:

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any waters of the United States is prohibited ..." 33 U.S.C. § 403.

sewer line itself was at a depth of 34.3 feet, and the concrete cap was approximately 30 feet below mean water level. The sewer line and its cap did not conform with the Corps' permit and the cap was an obstruction to navigation, in violation of the permit.

■■■ 13. The failure of a pipeline owner to comply with a permit issued by the Corps triggers application of the rule of *The Pennsylvania.* *M/V Alva,* 680 F.2d at 1383; *see also Peoples Natural Gas Co. v. Ashland Oil, Inc.,* 604 F.Supp. 1517, 1528 (W.D.Pa.1985) (the failure of a pipeline owner to comply with a term of the permit issued by the United States Corp of Engineers, which required that the pipeline be four feet below the riverbed, triggered the application of *The Pennsylvania* rule to the pipeline owner.)

14. The City's failure to maintain the sewer line and the concrete cap at the required depth constituted an obstruction to navigation and violated 33 U.S.C. § 403. As the Corps noted in its letter of December 18, 1958, the insufficient depth would be a menace to any vessel venturing outside the strict limits of the channel for any reason.

15. The *Louisiana* was only five feet outside the channel when it struck the concrete cap on the sewer line. Moreover, the *Louisiana* was drawing 33 feet and 4 inches of draft on its approach to Freeport Sulphur dock. The concrete cap on the sewer line, which was at a depth of 30 feet, posed an obvious hazard to the *Louisiana* if it veered out of the strict limits of the channel.

16. If the sewer line had been constructed at 40 feet mean low water, as the permit required, the cap would have been at a depth of approximately 36 feet mean low water, below the published depth of the channel. Although the pilot of the *Louisiana* lost control of the vessel and veered outside of the channel limits as a result, the existence of the concrete cap on the sewer line at a shallower than permit-

ted depth was a contributing cause of the allision. It still obstructed navigation even if covered by a thin layer of mud.

■■■ 17. The City has failed to show that its statutory violation could not have been one of the causes of the allision. Under the rule in the *Pennsylvania,* the City is also liable for damages.

■■■ 18. The City contends that it did not need a separate permit for construction of the concrete cap because it was a minor repair to a structure which already had a permit. *See* 33 C.F.R. § 330.5 [3]. However, the City's negligence arises from its construction of the sewer line at a shallower depth than required by the original permit which resulted in the creation of an obstruction when the concrete cap was built. It may not escape fault by suggesting that the repair did not require a permit. Therefore, the City is also at fault in this case.

■■■ 19. Although the pilot had knowledge of the general location of the sewer line, he did not know of the concrete cap which protruded from the line just outside the channel. The City had a duty to mark that location. *See generally Slater v. Texaco, Inc.,* 506 F.Supp. 1099, 1110 (D.Del. 1981) (a person who created a hidden obstruction in navigable waters has a duty to remove the obstruction or ensure that it is marked so as to afford adequate warning to vessels, and the failure to mark the obstruction constitutes negligence); *Marine Contracting and Towing Co v. McMeekin Constr. Co.,* 302 F.Supp. 804, 808 and n. 1 (D.S.C.1969) (defendant had a duty to place warning buoys over an invisible submerged obstruction and the failure to do so was negligence).

20. The City was also negligent in failing to mark the location of the concrete cap. As the owner of the sewer line, the City had the duty to warn mariners of submerged hazards to navigation. Its failure to do so was negligence and a proximate, contributing cause of the allision.

---

**3.** This regulation provides, in part, that "(m)inor deviations due to changes in materials or construction techniques and which are necessary to make repair, rehabilitation, or replacement are permitted." 33 C.F.R. § 330.5.

## C. Liability of Misener

21. Misener did not change the contours or elevation of the previously existing concrete cap when it repaired the cap in 1982 at the City's request and Misener did not own the sewer line.

22. Unlike the City, Misener violated no statutory duty which would give rise to a presumption of fault under *The Pennsylvania* rule. The dimensions of the concrete cap were the same before and after Misener's repair in 1982. Misener neither created nor contributed to the creation of an obstruction in navigable waters in violation of a federal statute. *See* 33 U.S.C. § 403 (prohibiting the "creation of any obstruction not affirmatively authorized by Congress, to the Navigable capacity of any waters of the United States"). Neither did Misener know that the sewer line was in violation of the permit issued by the Corps in 1949. Plaintiff has also failed to show that Misener had a duty to place a marker or warning at the site of the repair.

23. The evidence establishes no other basis for liability on the part of Misener for the damages incurred by the *Louisiana* on August 29, 1989 and plaintiff has relied exclusively on Misener's alleged violation of 33 U.S.C. § 403 in its claim of negligence. Therefore, judgment shall be entered for Misener on Count II of the amended complaint plus allowable costs. *See generally Cochran v. E.I. duPont de Nemours & Co.,* 933 F.2d 1533, 1540 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992) (district court may award costs to defendants under 28 U.S.C. § 1920 as prevailing parties).

### III

24. Liability for damages in maritime causes of action is to be apportioned on the basis of comparative fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). Liability may only be allocated equally among the parties when "the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." *Id.* at 411, 95 S.Ct. at 1716. "Fault which produces liability must be a contributing or proximate cause of the collision." *Harbor Tug & Barge, Inc. v. Belcher Towing Co.,* 733 F.2d 823, 826 (11th Cir.1984).

25. Due to the excessive speed of the vessel and the torque caused by the bottoming effects, directional control over the vessel was lost and the *Louisiana* continued to drift towards Seddon Island. The EDNA, a tugboat on the starboard side, was unable to get to its intended position of ninety (90) degrees, in order to assist the vessel in docking because of the excessive speed of the vessel.

26. Pilot Cahill, with the acquiescence of Captain Hopkins, engaged in a series of unsuccessful maneuvers to regain directional control. Pilot Cahill ordered the tugboat, the YVONNE, to go to ninety (90) degrees on the starboard bow and push the vessel away from the westerly bank of Sparkman Channel. However, the YVONNE was unable to achieve the intended ninety (90) degree position due to the excessive speed of the vessel. Additionally, the placement of the tugboat EDNA on the starboard quarter of the vessel, rather than the stern, further exacerbated the drift of the vessel towards Seddon Island. The *Louisiana* also failed to make timely use of its port anchor to stop the ship, since it was not dropped until after the allision.

27. The *Louisiana* is substantially more at fault than the City in causing the allision. The excessive speed and failure to make proper use of the tugboats was a major cause of the allision which occurred outside the channel. However, the City was also at fault and has not shown that the damage could not have occurred in the absence of its permit violation and failure to mark the hidden obstruction in the waterway.

28. Measuring the comparative fault, the *Louisiana* was seventy (70) percent at fault in the allision, and the City was thirty (30) percent at fault. Therefore, Plaintiff should recover from the City thirty (30) percent of the damages which it sustained as a result of the allision.

## IV

29. Federal law governs damages in a maritime case. The purpose of compensatory damages is to place the injured party as nearly as possible in the condition he would have occupied if the wrong had not occurred. *Freeport Sulphur Co. v. The S/S Hermosa,* 526 F.2d 300, 304 (5th Cir.1976).

30. The reasonable cost of repairs in this case including drydocking is $395,-346. This amount reflects an overtime charge of fifty (50) percent rather than the actual rate billed of sixty-seven (67) percent. The lower rate is the customary overtime rate in the Tampa area.

31. The out-of-pocket expenses reasonably incurred were $27,893.09. That amount does not include insurance ($22,-836.27) or the management fee ($6,527.34) as those expenses are in the nature of operating expenses and were not related to the casualty. Because the repairs were made by a third party, these fees may not be considered overhead, and are not recoverable as damages. *Compare Id.* at 304 (cost of repairs performed internally by injured party, including overhead, are recoverable in a negligence action).

32. Therefore, the total amount of damages is $423,239.09. The City is liable for thirty (30) percent of this amount or $126,-971.72.

## V

33. The City of Tampa contends that Florida Statute Section 768.28 precludes recovery of monetary damages against it in excess of $100,000. Fla.Stat. § 768.28(5) provides that the state and its agencies and subdivisions shall not be liable to pay a claim or judgment by one person in excess of $100,000. The statute specifically includes "municipalities" within the definition of "state agencies" or "subdivisions." *See* Fla.Stat. § 768.28(2). The City of Tampa also contends that prejudgment interest cannot be awarded for the same reason.

34. The City does not contend that it is immune from suit in federal court but rather that its liability is limited to no more than $100,000 in damages under the Florida Statute. If the City were sued in state court, this position would no doubt have merit. *See Schopler v. Bliss,* 903 F.2d 1373, 1379 (11th Cir.1990) (Section 768.28 expressly waives Florida's sovereign immunity from tort actions brought in its own courts, with certain limitations)

35. However, this federal court action, while involving diversity of citizenship, is more fundamentally a maritime tort action and, therefore, general maritime law governs. *See generally Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961) (in a diversity of citizenship suit, it was error to apply state contract law regarding the Statute of Frauds to a verbal agreement between a seaman and a shipowner, instead of federal admiralty law, where the agreement dealt with maritime concerns); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953) (since plaintiff in a diversity action was injured on navigable waters while working on a ship, the basis of his action was a maritime tort, and his rights were determined by federal maritime law). In the interest of uniform application of maritime law, federal courts exercising admiralty jurisdiction are not bound by local laws limiting liability of governmental agencies. *See generally Workman v. New York City,* 179 U.S. 552, 573–574, 21 S.Ct. 212, 220, 45 L.Ed. 314 (1900) (local law does not control maritime law and, therefore, cannot prevent liability of a municipal corporation for a maritime tort); *Rodgers & Hagerty, Inc. v. New York,* 285 F. 362, 362–364 (2nd Cir.1922), *cert. denied,* 261 U.S. 621, 43 S.Ct. 432, 67 L.Ed. 831 (1923) (provisions of city charter could not abrogate or limit liability on a maritime contract); *The Thielbek,* 241 F. 209, 214 (9th Cir.), *cert. denied sub nom.* 245 U.S. 661, 38 S.Ct. 61, 62 L.Ed. 536 (1917) (a municipal corporation's liability was not limited by a provision of state law which provided that no judgment could be entered against it in excess of $10,000, since local laws could not operate to abrogate or limit maritime law).

36. Defendant contends that the case of *Ex Parte New York,* 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921) is controlling, rather than *Workman.* This court disagrees.

37. In the *New York* case, the Supreme Court rejected the argument that the Eleventh Amendment (which applies to "any suit in law or equity") does not apply to admiralty and maritime cases in federal court. If held that a suit against the New York Superintendent of Public Works was in essence a suit against the state and was barred by the Eleventh Amendment. *Id.* at 500–503, 41 S.Ct. at 590–91.

38. The *New York* Court distinguished the *Workman* case as involving substantive admiralty law, rather than immunity from jurisdiction over a sovereign. *Id.* at 499, 41 S.Ct. at 590.

39. The *New York* case would be applicable if the City of Tampa was entitled to Eleventh Amendment immunity. However, municipalities are not an arm of the state under the Eleventh Amendment. *See Mt. Healthy City School Dist. Bd. of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (the Eleventh Amendment bar does not extend to counties and similar municipal corporations). *See also Schopler,* 903 F.2d at 1378.

40. The City also has made no showing that any damages awarded would be paid from the state treasury. *See generally Hutton v. Strickland,* 919 F.2d 1531, 1542 (11th Cir.1990) (the Eleventh Amendment affords protection where a plaintiff does not name the state as a defendant, but seeks damages that would be paid from the state treasury); *Lundgren v. McDaniel,* 814 F.2d 600, 605 n. 4 (11th Cir.1987) (the Eleventh Amendment does not preclude an award of damages against a county).

41. The fact that the State of Florida has expressly included municipalities within the limited waiver of sovereign immunity in Fla.Stat. § 768.28(5) does not affect the City's Eleventh Amendment immunity status. "(W)hile an entity may be a state establishment for purposes of the state constitution and state statutes, it may also exercise sufficient independence so that it cannot claim eleventh amendment immunity as an arm of the state under federal law." *Magula v. Broward General Medical Center,* 742 F.Supp. 645, 648 (S.D.Fla.1990).

42. State sovereign immunity has no application to a claim brought in federal court under federal law. *See generally Hufford v. Rodgers,* 912 F.2d 1338, 1341 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1312, 113 L.Ed.2d 246 (1991) (state sovereign immunity serves only to insulate the state from lawsuits in its own court and has no application to claims brought under Section 1983 in federal court); *Hill v. Dept. of Corrections,* 513 So.2d 129, 131 (Fla.1987), *cert. denied,* 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 989 (1988) (recognizing that the Eleventh Amendment protects state governments from suits in federal court while sovereign immunity protects state governments from suits in state court).

43. In the absence of Eleventh Amendment immunity, the City cannot limit its liability in federal court pursuant to Section 768.28 for a suit brought under federal admiralty law for a maritime tort committed in the navigable waters of the United States. Therefore, the City of Tampa is liable for all damages awarded against it.

44. Since Florida Statute Section 768.28 cannot limit the liability of the City of Tampa in this case, the City's argument that prejudgment interest is precluded on that basis must be rejected as well.

45. The general rule in admiralty cases is that the court should award prejudgment interest absent peculiar circumstances. *Steelmet, Inc. v. Caribe Towing Corp.,* 842 F.2d 1237, 1243 (11th Cir. 1988). However, cases of apportioned fault, as is the case here, present such a circumstance. *See Parker Towing Co. v. Yazoo River Towing, Inc.,* 794 F.2d 591, 594 (11th Cir.1986). Plaintiff is, therefore, not entitled to prejudgment interest.

46. Because summary judgment was entered in favor of defendants on

Count I of the complaint (private and public nuisance) in an order dated July 30, 1991 (Dkt. 52), and both plaintiff and the City were at fault in the August 29, 1989 collision, it would be inequitable to award costs to either party on Count II. Therefore, both plaintiff and the City should bear their own costs. *See Stevens v. F/V Bonnie Doon,* 655 F.2d 206, 210 (9th Cir.1981) (court could require each party to bear its own costs in a maritime collision case); *Holden v. S.S. Kendall Fish,* 395 F.2d 910, 913 (5th Cir.1968) (assessment of costs in an admiralty case is discretionary).

### VI

Accordingly, plaintiff shall recover damages from the City in the amount of $126,-971.72, each party to bear its own costs on the negligence claim in Count II.

As to the claim of plaintiff against Misener in Count II, judgment is entered in favor of Misener with costs assessed against plaintiff under 28 U.S.C. § 1920.

The Clerk shall enter judgment accordingly.

DONE and ORDERED.