**TAMPA PORT AUTHORITY, Plaintiff,**

and

**Westchester Fire Insurance Co.,
Intervening Plaintiff,**

v.

**M/V DUCHESS, In rem, and BT Straits,
Inc., In Personam, Defendants/Third
Party Plaintiff,**

v.

**Pilot Lambert W. Ware, Third
Party Defendant.**

**No. 94–1727–CIV–T–23C.**

United States District Court,
M.D. Florida.

June 6, 1997.

Lance Sheldon Hamilton, Holland & Knight, LLP, Tampa, FL, for Tampa Port Authority, Body corporate and politic by and under the laws of the State of Florida.

Donald Lee Craig, E. Tyron Brown, Butler, Burnette & Pappas, Tampa, FL, for Westchester Fire Insurance Company, as subrogee of the Tampa Port Authority, et al. fka International Insurance Company.

Nathaniel G.W. Pieper, Lau Lane, Pieper, Conley & McCreadie, Tampa, FL, for BT Straits, Inc., M/V Duchess.

Margaret Diane Mathews, Anthony John Cuva, Akerman, Senterfitt & Eidson, P.A., Tampa, FL, for Lambert M. Ware, Pilot.

## MEMORANDUM OPINION

JENKINS, United States Magistrate Judge.

This cause comes on for consideration of an admiralty matter brought pursuant to Rule 9(h), Fed.R.Civ.P. in connection with an allision on December 25, 1992 involving the vessel M/V DUCHESS ("DUCHESS") and the northwest corner of the Robert E. Knight Pier ("Pier") owned by the Tampa Port Authority ("TPA").[1]

TPA brings a claim of negligence against DUCHESS in rem and its owner,

---

1. The parties have consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

B.T. Straits, Inc. ("B.T.Straits"). Intervening plaintiff Westchester Fire Insurance Company ("Westchester") brings a subrogation claim against DUCHESS and B.T. Straits to recover insurance payments made to TPA in connection with the damage to the Pier. B.T. Straits and DUCHESS bring a third-party claim of negligence pursuant to Rule 14(c), Fed.R.Civ.P. against Lambert Ware ("Ware"), a Tampa Bay harbor pilot in command of the DUCHESS at the time of the allision.

On September 13, 1996, partial summary judgment was entered in favor of plaintiff TPA and Westchester against the DUCHESS as the vessel had not rebutted the presumption that a vessel colliding with a fixed object is at fault in an allision. The order granting summary judgment did not make any findings allocating fault among the various parties for the allision or resolving damages issues; nor did the order determine the cause of the allision. (Dkt.58)

A four-day non-jury trial was conducted on October 15 – 19, 1996. The parties then engaged in supplemental discovery as a result of certain matters occurring at the trial. The court reopened the evidence and received additional testimony and exhibits on January 16 – 17, 1997.[2]

Thereafter, the parties filed proposed findings of fact and conclusions of law and various memoranda, all of which have been considered by this court, in addition to the testimony and exhibits received at trial.

Pursuant to Rule 52, Fed.R.Civ.P., the following findings of fact and conclusions of law are entered.

### Findings of Fact

1. Plaintiff, Tampa Port Authority (TPA), created under the laws of the State of Florida, owns and operates the REK Pier in Tampa Bay.

2. Intervening plaintiff Westchester, a corporation doing business in the State of Florida, was the property insurance carrier for TPA at the time of the allision.

3. *In rem* defendant DUCHESS is a U.S. flag registered oil tanker, measuring 672 feet long and 89 feet wide and capable of carrying cargo of up to 40,000 tons. When fully loaded, the draft is approximately 35 feet.

4. *In personam* defendant B.T. Straits is a corporation which owned the DUCHESS at the time of the allision.

5. Third party defendant Lambert Ware ("Ware") is a Tampa Bay harbor pilot who was in command of the DUCHESS at the time of the allision as a compulsory pilot as required by U.S. law and Coast Guard regulations.

6. On December 25, 1992 at 0130 hours, the DUCHESS struck the northwest corner of the Richard E. Knight (REK) Pier ("Pier"). The allision occurred while the vessel, fully loaded with cargo weighing approximately 37,000 tons, was being shifted from Berth 220 to Berth 226.

7. The DUCHESS sustained a three inch indentation in its bow as a result of the allision, which did not affect the seaworthiness of the vessel and was determined by a marine survey to be repairable at the next drydocking of the vessel. No claim for damages to the vessel is made in this case. Rather, the dispute in this case centers on what dock damage was caused by the DUCHESS and what damage pre-existed the allision.

8. Ware, a Tampa Bay harbor pilot with approximately 24 years experience, possessed all necessary Florida and Coast Guard licenses. He was very familiar with the Pier and its berths, including the condition of the Pier at the time of the allision. Ware had also piloted the DUCHESS on at least one other occasion.

---

**2.** Additionally, an evidentiary hearing was conducted on February 13, 1997 in connection with defendants' motion for sanctions for plaintiff TPA's failure to provide certain documents prior to trial in response to discovery requests. The motion for sanctions is addressed in a separate order.

9. Pilot Ware was assisted by the master of the vessel, Captain Herman F. Custin ("Custin"), licensed by the Coast Guard as a master in 1948 who had served as a ship captain since 1964.

10. The REK Pier is a concrete structure referred to as a "finger pier," approximately 900 feet long and 40 feet wide, which is owned and operated by the TPA in an area known as Hooker's Point, Cut D, a 400 foot wide channel which empties into Tampa Bay.

11. The Pier includes two berths: Berth 226 is on the north side of the pier and Berth 227 is on the south side of the pier.

12. The pier is used for five different terminal storage transfer facilities, four involving petroleum products and one a hydrous ammonia facility.

13. According to Steven L. Fidler ("Fidler"), TPA operations manager, approximately 400 vessels use the REK Pier annually resulting in approximately one and one-half billion dollars of revenue from this activity. (JX 113, 115)[3]

14. At the time of the DUCHESS allision, the outboard 100 foot section of the Pier was under repair pursuant to a project known as the "fender renovation project." However, the Pier was still being used for commerce during this construction period.

15. Both Ware and Custin were aware of the weakened condition of the Pier and the need to use extra caution in docking at the berths. In fact, Ware stated that the pilots nicknamed the concrete corner of the Pier, which did not have fendering, as "the can opener." He testified that the northwest corner was "a horror story waiting to happen for a loaded tanker of gasoline to be punched in the side" because there were no "double-hulled tankers back in those days and it would be easy to spill." (T1, p. 163)

## The Maneuver

16. Prior to commencing the shifting maneuver, Ware met with the captain and the officers and was acquainted with the vessel's specifications. He had piloted the DUCHESS on at least one prior occasion.

17. During the entire shifting operation, Ware and Custin were on the bridge of the vessel, starboard side. Ware, as the compulsory pilot, gave the engine commands and steering orders.

18. The DUCHESS proceeded in a northerly direction from Berth 220 towards Berth 226 at a speed of two to three knots assisted by two tugs. Visibility was good and there were no unusual wind or weather conditions.

19. Ware received accurate and timely distances from the ship's officer stationed at the bow of the vessel throughout the maneuver. The tugs were also in good working order and followed the pilot's commands.

20. As was his custom in docking a vessel at Berth 226 from the south, Ware planned to stop the headway of the vessel to bring the bow due west of the pier. Using the tugs, the vessel would then be pivoted starboard and moved into the slip parallel to the berth.

21. However, as the DUCHESS drew even with the Pier the forward momentum continued. A 0122 a dead slow order was given by Ware. At 0124 the tug ORANGE was shifted to the stern. At 0126 the tug KINSMAN was shifted to the starboard bow and a stop engine order was noted in the vessel's bell book at the same time. (JX 78)

22. Although Ware testified that at 0133 he gave a full astern order when the DUCHESS was approximately 150 to 200 feet from the REK Pier, the full astern order was not entered in the bell book until 0135, the same time that the bow of the DUCHESS struck the northwest cor-

---

**3.** The parties' joint exhibits are referred to by the letters "JX" followed by the exhibit number. Any individual exhibits of the plaintiffs or defendants are referred to by the letters "PX" or "DX" followed by the exhibit number.

ner of the pier. However, Ware further stated that the engines were full astern and the DUCHESS was "dead in the water" when the bow of the DUCHESS hit the concrete corner of the REK Pier. (T1, p. 141) (JX 78)

23. Despite the discrepancy in the bell book, it appears that the full astern order was promptly executed by the ship's crew at 0133.

24. Ware was not aware of the impact until the officer on the bow advised Captain Custin and him of the allision.

25. In a written statement after the incident, Captain Custin stated that "[t]he Pilot's performance and comportment was observed to be beyond reproach, correct and professional in every respect, however, the casualty appeared to be due to an error in the Pilot's judgement [sic]". (JX 75)

26. Although the vessel had not lost its headway when the turning maneuver began, by the time it struck the Pier the full astern order had virtually stopped its forward momentum. While both the dock and vessel were damaged as a result of the allision, the DUCHESS had practically come to a halt at the time it made contact.

27. The U.S. Coast Guard's investigation of the allision resulted in a finding that Pilot Ware "was considered to be negligent in relying too heavily on the ship's engines in lieu of using the tugs alongside." However, it was considered a "minor incident because of the small amount of damage to the vessel's bow and the pier." Also, as Ware had no prior record, a letter of warning was issued in lieu of initiating a formal proceeding against his license. No findings of fault were made as to the vessel's master, officers or its crew or the two tugs. (JX 94)

28. The damage to the DUCHESS was slight, causing a three inch indentation about three feet from the stem approximately five feet above the waterline. (JX 78)

29. Pilot Ware testified that, in his opinion, the allision could have been avoided if he had received a faster response from the engine. Ware also stated that the damage would not have occurred if fendering had been on the corner of the pier. (JX 178)

30. Despite Ware's statement, there is no credible evidence that either the vessel's officers or crew acted improperly or negligently in carrying out the pilot's orders in a manner to cause or contribute to the allision.

31. Nor is there any credible evidence that the vessel's engines were defective or not properly maintained.

32. Although Ware testified that he gave a full astern order at 0133 which was not recorded in the engine bell book until 0135 (the point of impact), there is no evidence, in the form of expert testimony or otherwise, that the full astern order was not implemented in a timely manner.

33. Captain Custin stated that the third mate executes the order and then records it in the bell book. (T4, p. 91) Further, the master was able to view the tachometer on the wing of the bridge and could see that the engine orders were being promptly executed. (T4, p. 94)

34. As stated, the Coast Guard did not fault the master, officers or crew of the DUCHESS and found that Pilot Ware was the only participant in the docking operation at fault in the allision.

35. The pilot's failure to stop the headway of the vessel once it drew even with the Pier and began the turning maneuver towards Berth 226 was the sole cause of the allision between the DUCHESS and the northwest corner of the REK Pier. This failure was due to errors in Pilot Ware's judgment in not conveying proper orders to the vessel's engine room and the tugs to slow the speed of the DUCHESS as it drew even with Berth 226 and began pivoting towards the dock.

36. TPA personnel are supposed to stand by for all dockings and undockings at the REK Pier to record docking and

undocking times and also to notify TPA of any damage to the pier or vessels.

### Reports of the Allision

37. On December 25, 1992, Security Operations Officer Ralph Palmer ("Palmer") was on duty at the REK Pier.

38. Palmer's report of the DUCHESS allision makes no reference to any deck displacement. Palmer stated that the port side of the bow of the DUCHESS slightly struck the pier and that he could not pinpoint the damage because it was already under repair from prior damage by other vessels. (JX 20; JX 168)

39. Initially, Palmer had reported no damage to the dock. Steve Fidler, Palmer's supervisor, asked Palmer to explain the discrepancy in his findings but Palmer persisted in his view that he was uncertain what damage was caused by the DUCHESS but in any event it was minor. (DX 8, 9B, 21–22)[4] By memorandum dated February 1, 1993, Fidler found Palmer's actions to have been "unsatisfactory and inconsistent with accepted procedure" and this reprimand was placed in Palmer's personnel file. (DX 256)

### The Condition of the REK Pier Prior to the DUCHESS Collision

40. Originally built in 1943 as a wooden structure with wooden pilings, the REK Pier was refurbished in 1968 with concrete pilings and a concrete deck. However, the wooden pilings were not removed but were reinforced with the concrete pilings. (JX 87)

41. In 1986 TPA received permission from the U.S. Army Corps of Engineers to construct a fendering system for the REK Pier with a permit expiration date of September 1986. (JX 97; T2, p. 235) However, for some reason which is not apparent from the record, this project was not undertaken at that time.

42. Over the years, the REK Pier, in particular the outboard end, had sustained damages from vessel impacts and had also deteriorated due to the passage of time.

43. The "fender renovation project" which was in progress on the date of the allision was pursuant to a contract between TPA and Durocher Dock & Dredge, Inc. (Durocher). The project was to consist of:

> general construction of a foam filled fendering system for the existing REK (Richard E. Knight) Pier at the Tampa Port Authority, Tampa, Florida. In addition to providing the new foam filled fenders complete with anchor chains and hardware, the Work includes selective demolition, prestressed concrete bearing piles, cast-in-place concrete pile caps, concrete repair work, and fixed corner fendering.

(JX 17)

44. Gary Dupere ("Dupere"), a Gee and Jensen engineer, explained that Durocher was to repair some of the existing outer piles that had previously damaged by placing "pile jackets" around ten of the piles.[5] He further explained that the project

> consisted of constructing a pile cap, which in this case was a larger pile cap, larger piece of concrete, to support the fenders and take the lateral loads, incorporate the bearing piles that were in there. And also on the outboard end, it involved constructing a U-shaped element to, again, incorporate the end of the structure supporting the fenders and providing lateral-load capacity.

(T1 – 48) With this design, existing inner pilings were to be retained with the original dock they supported.

45. Work commenced on this project in October 1992 for an agreed price of $1,668,995 which called for the work to be completed within 360 days. (JX 18) This work had not been completed as of Decem-

---

4. Exhibits DX 8, 9B, 21–22 and DX 256 were presented at the reopened trial on January 16 and 17, 1997.

5. Dupere explained that "pile jackets" were created by placing reinforced steel around the outside of the piling and then filling it with concrete. (T2, p. 38–39)

ber 25, 1992 when the DUCHESS struck the northwest corner of the REK Pier.

46. In the year and a half preceding the DUCHESS allision two surveys were conducted of the outbound 100–foot section of the Pier by outside engineering firms at the direction of TPA.

47. Both of these inspections were due to a vessel impact which occurred in March 1991 and caused a transverse crack across the entire width of the REK Pier at the approximate 812 foot mark about 88 feet from the outboard end of the Pier.

48. A TPA dock damage report dated March 22, 1991, reported damage to the REK Pier occurring sometime during the prior several days and described the damage as follows:

> Location at the 805' mark, string piece snapped off pins, concrete damage to face approximately 9 feet in length, 15 inches in width, and approximately 3–5 inches in depth. Concrete spalling and severe cracking along entire concrete pad seam. Western slab displaced upward approximately 1 inch. Damage is apparent across the full width of REK Pier.

(JX 176)[6]

49. Hector Pinion ("Pinion"), the security officer who prepared the report, stated that how the damage had occurred was unknown but the only vessel movement during the time frame of the accident was the shifting of the tug JAMES DANOS and the barge GREGORY from Berth 227 to 226. (JX 176).

50. Another security officer, Charles Alderman, prepared an activity report for March 17, 1991 reporting "[m]ajor dock damage" to Berths 226 and 227 at the approximate 810–foot mark location. (DX 24)[7]

51. Despite the extensive damage caused by this incident, TPA did not file a claim with its insurer. (T3, p. 52)

52. A TPA dock damage report dated April 19, 1991 (JX 15) stated that an unknown vessel had caused damage to Berth 226 consisting of a broken piling and missing fender at the 450 foot mark of Berth 226.

53. In April 1991 the engineering firm Greiner Inc. (Greiner) inspected 32 pilings at the mudline and pile-bent connections at the outbound 100–foot end of the Pier and found some damage to 17 pilings in varying degrees, mostly at the last four to five feet of the Pier, but no damage at the mudline. The Greiner report noted that all of the damage or deterioration "existed prior to the most recent dock damage" due to the degree of corrosion noted on the reinforcement rods. It concluded that in light of renovation projects scheduled in the future, a survey of all the pier pilings should be conducted as the "conditions noted in the 32 piles inspected are likely to exist throughout the pier." (JX 12) Although Smith found some damage to what he called a "construction joint" 812 feet from the beginning of the Pier (apparently the damage caused by the unknown vessel impact in March 1991), he saw no recent damage to the pilings under the pier. However, he thought that some of the pilings 30 to 40 feet from the end of the pier needed repairs. (JX 12, 176)

54. Another engineering firm, Gee and Jensen, surveyed the outbound 100 feet of the Pier in December 1991. Its findings generally agreed with the Greiner report but noted some signs of recent damage. In addition, the Gee and Jensen survey noted that at the approximate 812–foot mark (referred to as "STA 8 + 12"), "it appears that vessel impact has caused the

---

**6.** This document was not provided to defendants by plaintiff in response to discovery requests until several days prior to trial. The parties dispute the reasons for the late disclosure and the circumstances surrounding this dispute were addressed at the sanctions hearing held on February 13, 1997 which also concerned TPA's failure to produce other documents.

**7.** This exhibit was introduced at the reopened trial on January 16–17, 1997.

concrete deck slab and edge beams to be crushed and broken-up at a construction joint" and "the edge beams on both the north and south sides of the pier are severely damaged at numerous locations, with large sections of concrete being broken away and the exposed reinforcement corroding, and in some cases broken away due to the impact." (JX 13, p. 2)

55. Dupere, the Gee and Jensen engineer in charge of the inspection, recommended that the bollards (large cleats) at the severed end of the Pier not be used until the repairs could be made but TPA officials rejected that suggestion based on their insistence that the Pier remain in use. (T2, p. 45) Dupere's report stated that the Pier, in its present state, was not in a "life threatening condition" and that the repairs caused by the impact could be addressed as part of the fender renovation project as long as those repairs are completed in a timely manner. However, it was noted that " . . . should a vessel again impact the end of the pier or sudden wind gusts cause a high mooring line load on an end bollard, additional damage could result, and possibly even a localized failure could occur at the outboard end of the pier." (JX 13 p. 2).[8]

56. On August 26, 1991, the Tampa Bay Pilots Association wrote a letter to TPA advising of concern over the condition of the REK Pier. The letter noted that the pier was cracked across the entire width and there was insufficient fendering (tires). (JX 82)

8. Also, a Gee and Jensen memo of a meeting with TPA officials concerning the fender renovation project dated December 9, 1981 noted that "the outboard end of the pier has been impacted a number of times, with some of the piles being damaged and the pier deck broken-open at approximately STA 8 + 12 . . . . In addition to the repair of this damage, the end will need to be reinforced with the addition of three (3) 5 ft. diameter fenders and four (4) corner fenders." (JX 6)

9. During trial on October 16 and 17, 1996 counsel for defendants moved for a continuance to allow discovery into whether a barge had hit the REK Pier close in time to the

57. Pilot Lambert Ware knew of this condition as did various linehandlers who worked at the Pier. Both Steve Fidler and Carl Fielland, TPA officials, knew of this condition as well.

58. Additional evidence was presented on January 16 and 17, 1997 concerning whether the REK Pier experienced another vessel impact within days of and prior to the DUCHESS allision.[9]

59. Testimony was received from line handlers Jerry Sutter ("Sutter"), David Desautell, and David Desautell's wife, Regina Desautell, who sometimes assisted him with his work. Sutter testified he observed the stern of a barge stuck under Berth 226 (referred to as "GATEX" by some witnesses) at the REK Pier during daylight hours on December 24, 1992. Sutter testified that the barge was stuck in the vicinity of the crack which developed along the construction joint at the 810 foot mark of the REK Pier and he observed that the concrete deck had been raised about three inches due to the impact. (EH1, p. 124–132) Sutter testified that he encountered his sister, Regina Desautell, and her husband, David Desautell (another line handler), after he left the REK Pier and they returned with him to see if they could assist in freeing the barge. On arriving at the Pier, the barge was no longer stuck under the Pier and was at Berth 223. (EH1, p. 171–173)

60. However, TPA records show no record of any such incident and the vessel movement records for Berths 226 and 227

DUCHESS allision, based on information related to defendants' counsel, Mr. Pieper, during trial by prospective witnesses. Court was adjourned during the morning of October 16 to allow the parties to depose one of the prospective witnesses about the alleged barge incident. This court thereafter denied the motion to continue but ruled that the record would be held open and the parties allowed to engage in supplemental discovery on this issue. (T3, p. 169) Subsequent discovery and motions of the parties led to the trial being reopened in January 1997 for receipt of additional evidence and testimony on behalf of the parties.

for this period of time (and several days preceding it) do not show a barge fitting the description provided by Sutter as having docked at Berth 226 or any other location where it could have been wedged under the REK Pier. (EH2, p. 45–49; 72–77; 81–85).

61. Sutter was obviously mistaken about the date when he observed this barge incident. It is possible that the barge incident Sutter witnessed was the impact in March 1991 which caused the transverse crack across the deck slab of the Pier and associated damage. This conclusion is reinforced by the testimony of Lawrence Hillman, a TPA security officer, who reported the damage from that incident. Hillman testified that a line handler named "Dave" (Dave Desautell) told him about the damage caused by the tug and barge. (EH2, p. 86–88)

62. While the evidence does not substantiate defendants' claim of dock damage close in time to the DUCHESS allision, the preponderance of credible evidence does establish that the transverse fracture of the Pier, which occurred in March 1991, seriously compromised the structural integrity of the outbound section of the Pier. This damage pre-existed the DUCHESS allision.

63. The damage caused by the DUCHESS was relatively minor in comparison to the already seriously deteriorated condition of the Pier due to prior vessel impacts and general wear and tear on the 50 year-old structure.

### Evidence as to Force of Impact and Angle of Approach

64. Both plaintiff and defendants presented expert testimony as to the probable force of impact on the Pier caused by the DUCHESS allision.

65. TPA's witness, George Petrie ("Petrie"), analyzed the force necessary to produce the three-inch dent in the bow plating of the DUCHESS and concluded that a

force between 410,000 pounds and 640,000 pounds would be required depending on the direction of the force. (T1 – 209)

66. Charles A. Manning, Jr. ("Manning"), called by the DUCHESS and its owner, conducted a similar analysis but concluded that a force of between 330,000 and 410,000 pounds would be necessary to produce the three-inch indentation in the bow of the DUCHESS. (T3, p. 115)

67. The different assumptions made by Petrie and Manning about the angle of approach to the Pier (and the speed of the vessel) account for the differences in their opinions as to the force of impact. This court finds the testimony of Manning more credible.

### Damages Estimates and Repairs Made After the Collision

68. After the DUCHESS allision, the outboard section of the REK Pier was inspected by various representatives of the parties. At the request of TPA, Gary Dupere of Gee and Jensen conducted an on-site inspection on January 8, 1993 with a follow-up underwater inspection on January 12, 1993.

69. Dupere concluded that the section of the Pier undergoing renovation by Durocher had suffered additional damage due to the DUCHESS allision.[10] His report noted that of the 26 piles supporting the severed outboard end of the Pier, 20 were planned to be reused in the modified pier structure. (JX 27) Dupere admitted, however, that all but three of the 26 piles had sustained damage at one time or another. (T2, p. 169) His report noted that 17 of the 20 piles had suffered recent damage. He also found that the six piles scheduled to be removed on the outer end of the Pier had also sustained more damage.

70. Dupere opined that the impact caused by the DUCHESS allision had caused the severed or outboard 90 feet of the Pier to be rotated counterclockwise,

10. Dupere was the same Gee and Jensen engineer who inspected the REK Pier in December 1991.

displacing the northwest corner of the Pier to the south and the inboard section of the Pier to the north and causing a skewed alignment. However, he noted that some cracking in the deck slab inboard of the severed end was probably due to vibrations from the pile drivers used by the contractor. While recognizing that the original design might be salvaged with addition of more pile caps to repair the additional damage, Dupere rejected that "band-aid" approach and recommended that the entire outboard severed end of the Pier be demolished and replaced with new pilings and deck. (JX 121)

71. Dupere submitted a new design on behalf of Gee and Jensen for the renovation project which essentially called for replacing damaged pilings with new pilings and rebuilding the entire outer 100 feet of the Pier including the concrete deck. His estimate for this work was approximately $214,655, but Dupere recognized that the contractor might have additional costs such as materials which could not be used in the new design and administrative costs already expended. (JX 30)

72. After reviewing the Gee and Jensen report, TPA agreed with its recommendation and obtained a bid from its contractor, Durocher.

73. TPA determined that allowing Durocher to do the additional repair work was more economical because submitting the additional work to the bid process would delay the repairs. The Port Engineer, Carl Fielland, testified that "with the premise of keeping the pier in operation, there was no more efficient manner to complete the work." (T2, p. 228)

74. However, it is uncontroverted that TPA's decision to proceed with the renovation project on a piecemeal basis so as to allow the Pier to remain in operation resulted in more time by Durocher and thus higher costs. (T2, p. 175)

75. Durocher's initial bid for the new design was $668,122, a figure which Gee and Jensen disputed in a letter to TPA dated February 23, 1993 recommending that a detailed quantity and cost breakdown be obtained from the contractor. In addition to noting that "[t]he cost as proposed exceeds $138/SF for the pier work, and a major portion of the pier is already in the original contract price," the letter stated that the 122 additional days of work estimated by the contractor "is about twice as much time as should be required, considering the scope of the work already intended to be accomplished for the end of the pier" but recognized that some construction downtime needed to be included to allow for vessels being at berth. (JX 33)[11]

76. Durocher and TPA subsequently entered into a modification agreement in April 1993 known as Change Order 3. The modification was the subject of negotiations between TPA and the contractor which resulted in eliminating $124,000 from the contractor's bid and a final price of $522,759 for the additional work of demolishing and rebuilding the outer section of the Pier. (JX 37; JX 122).

77. TPA paid Gee and Jensen a total of $22,062 for the 1993 inspection and design work: $5,922 for the damage report, $13,-140 for drawings and geotechnical services, and $3,000 for services during construction. (JX 141) Additionally, TPA paid $720 to Amdiver, a diving firm which assisted Gee and Jensen with its survey. (JX 100) (T3, p. 46)

78. Charles Harden ("Harden"), a Tampa marine surveyor and appraiser with extensive experience and an engineering background, inspected the DUCHESS and the REK Pier at the request of the owner of the DUCHESS. Harden found very minor damage to the bow plating on

11. Gary Dupere testified at trial that in addition to having to do the work on a piecemeal basis to accommodate vessel movements, the contractor's high costs for the redesigned pier work could be due to Durocher's being the low bidder on the original bid which could have caused it to adjust its costs upward for the additional work after the DUCHESS allision. (T2, p. 176–177); (JX 54).

the starboard side of the bow of the vessel, an area about three inches deep and 16 by 20 inches in area. The damage did not affect the seaworthiness of the vessel. (T4, p. 11–13)

79. On January 11, 1993, Harden and Leroy Pate ("Pate"), a licensed engineer, inspected the outer section of the Pier by boat. They found some crushing-type damage to the northwest corner of the Pier which had caused some of the concrete to fall away. Harden observed that the Pier was in "very poor condition," approaching the end of its useful life. Twenty-two of the 36 piles in the outer 90 feet of the Pier showed substantial damage. Only nine of the 22 piles showed signs of recent damage in addition to old damage. Six of the concrete pile caps also showed signs of recent damage. There were some fresh cracks at the fracture of the deck slab and the junction of the concrete slab and the spandrel beam which connects the pilings and provides lateral support. (T4, p. 24–28)

80. Harden estimated the costs to repair the damage caused by the DUCHESS as approximately $145,000 based on replacing nine piles, repairing six pile caps, and associated minor repairs. Of this amount, $25,000 was for repair of the crushed concrete at the northwest corner of Berth 226. (T4, p. 19–20)

81. Leroy Pate, who inspected the Pier with Harden, observed the fracture across the entire width of the Pier just past the 810–foot mark which ran from "side to side and top to bottom" and had displaced the deck an inch or so. He, like other witnesses, confirmed that the fracture was not recent damage because the re-bar was quite rusty and had apparently been exposed to the elements for some time.

82. This fracture, in Pate's view, caused the outer portion of the Pier to be "greatly weakened" along with the other damage from wear and tear and other vessel damage prior to the DUCHESS allision. Because of this, the outer end was in such bad shape that it would not be able to absorb any lateral or rotational impacts from a vessel. Pate agreed with Harden's identification of the piles and pile caps which showed recent damage attributable to the DUCHESS allision. He saw no signs of rotational damage, however, caused by the DUCHESS allision. (T3, p. 144–168); (JX 89)

83. Another defense witness, Charles A. Manning, Jr., agreed that the structural integrity of the REK Pier had been compromised prior to the DUCHESS allision, including damage to the spandrel beams which are lateral supports for the deck and connect the pilings. (T3, p. 95–96)

84. Both Manning and Harden thought that the DUCHESS allision had caused some rotational damage to the Pier. (T3, p. 99; T4, p. 17–39) However, Pate found no signs of rotational damage. (T3, p. 144–168). Nor did Ralph Palmer, who was the security officer first on the scene after the allision. All witnesses agreed that the damage caused by the DUCHESS was relatively minor in comparison to the already badly deteriorated condition of the outer end of the Pier.

85. Reuben Clarson ("Clarson"), a licensed engineer with experience in marine construction, was retained by GAB Business Services, the adjuster for Westchester (TPA's property insurance carrier), to review the Gee and Jensen report assessing the damage caused by the DUCHESS allision and to determine the reasonable costs for the repair work recommended by the engineering firm.

86. When Clarson visited the REK Pier in October 1993, the new construction was basically finished. He was told to assume that there were no time constraints and no ship interference in determining the repair costs since the policy was issued on a blanket replacement basis. (JX 61) Based on that assumption, he determined that the reasonable cost for the repairs recommended by Gee and Jensen was $390,335. (T3, p. 64; JX 161) Clarson's original estimate was $242,996 but he revised this estimate upwards after receiving additional information from TPA and

the contractor. (T3, p. 70; JX 52) His estimate did not take into consideration any deductions for depreciation or betterment. (T3, p. 71)

87. After negotiations, TPA agreed to submit a claim for $338,117 which was calculated by subtracting $75,000 (the amount of the deductible on the policy) from $413,117, the total figure recommended by Clarson which included his estimated cost of repairs of $390,335, plus the $22,062 Gee and Jensen design fee and the $720 fee paid to Amdiver for the diving work.

88. Westchester subsequently paid this amount to TPA reserving a right of subrogation. (JX 67–68; JX 147)

89. The preponderance of credible evidence demonstrates that the deck fracture at the 812 foot mark and the failure of the reinforcing steel at that section was not caused by the DUCHESS allision. Nor was the outer section of the Pier significantly damaged as a result of this allision. Further, practically all of the support pilings at the outboard end of the REK Pier had pre-existing damage to one extent or another; some pilings which showed recent damage also showed significant pre-existing damage. Other than additional damage to some of those pilings or pile caps, the only new damage caused by the DUCHESS allision was the crushing of the concrete at the northwest corner of Berth 226.

## CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter of this action and the parties pursuant to Title 28, United States Code, section 1331.

In this action, the Tampa Port Authority has sued BT Straits in personam and Duchess in rem to recover the costs of repairs to the Pier. BT Straits and Duchess filed a third-party action against Pilot Ware for indemnification.

■■ In admiralty law, when a moving vessel collides with a fixed object, there is a presumption that the moving vessel is at fault and this presumption gives rise to a prima facie case of negligence against the vessel. This presumption applies to the operator as well as the vessel and to "all parties participating in the management of the vessel at the time of the contact." *Woods v. U.S. Dept. of Trans.*, 681 F.2d 988, 990 (5th Cir.1982); *see also Merrill Trust Co. v. Bradford*, 507 F.2d 467, 471 (1st Cir.1974).

■ This presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The vessel must show that it was without fault, that the allision was the fault of the stationary object, or was the result of inevitable accident. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir.1977), *cert. denied, Furness Withy & Co. v. Bunge Corp.*, 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978) (footnote and citations omitted).

### A. Negligence of Pilot Ware

■ The evidence of Ware's fault is substantial. As the pilot, he was responsible for control of the vessel at all times while it was underway in navigable waters. Fla. Stat. § 310.141. Ware failed to turn the DUCHESS into the slip in a timely manner. It is apparent that Ware's negligence was the contributing cause of the allision.

### B. Negligence of DUCHESS

■ The vessel is liable in rem for the negligence of a compulsory pilot. *Amoco v. M/V Montclair*, 766 F.2d 473, 476 (11th Cir.1985). As Ware was a compulsory pilot and there is no argument that he was piloting a "dead ship," the DUCHESS is liable in rem for Pilot Ware's negligence.[12]

12. Further, this court previously found in its September 13, 1996 order granting partial summary judgment in favor of TPA and Westchester that the DUCHESS failed to overcome the presumption of negligence arising from the allision. (Dkt.58)

### C. Liability of BT Straits

 The negligence of Pilot Ware, while imputed to the vessel, may not be imputed to the vessel's owner, captain, or crew absent evidence of negligence on their part. While the presumption of fault in an allision applies to all those involved in the management of the vessel at the time of the allision, *see, e.g., Woods v. United States Dept. of Transp.*, 681 F.2d 988, 990 (5th Cir.1982), the showing made by the vessel owner has overcome the presumption of fault.

 The master of a vessel with a compulsory pilot "... is entitled to assume that the pilot is an expert on local conditions and practices, until it becomes manifest that the pilot is steering the vessel into danger." *Avondale Indust., Inc. v. Int'l Marine Carriers, Inc.*, 15 F.3d 489, 493 (5th Cir.1994) (citation omitted). There is no evidence that the danger was so imminent that Captain Custin was negligent in failing to intervene and take the conn from Pilot Ware. Further, a master should not displace the pilot unless the pilot is intoxicated or manifestly incapacitated. *Union Shipping & Trading Co. v. United States*, 127 F.2d 771, 775 (2nd Cir. 1942); *Dampskibsselskabet Atalanta A/S v. United States*, 31 F.2d 961, 962 (5th Cir.1929). Ware was neither intoxicated nor manifestly incapacitated.

There is also no evidence that the crew was negligent. The preponderance of the evidence shows that the crew timely responded to Pilot Ware's commands and gave him correct information. Moreover, there is no evidence that the Duchess' engines were defective.[13]

Thus, B.T. Straits is not liable in personam for the damage inflicted on the REK Pier as a result of the DUCHESS allision. *See Complaint of Chevron Transport Corp.*, 613 F.Supp. 1428 (M.D.Fla.1985), *aff'd in part and rev'd in part*, 832 F.2d 1540 (11th Cir.), *cert. denied*, 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988).

### D. Negligence of TPA

The order granting partial summary judgment in favor of TPA and Westchester rejected defendants' argument that TPA's failure to maintain the condition of the Pier and warn of the condition caused the allision. (Dkt.58) These conclusions are incorporated herein.

Defendants' reliance on *Phillips Petroleum Co. v. Trinidad Corp.*, 1979 A.M.C. 1352 (M.D.Fla.1978) is misplaced.

The court in *Phillips Petroleum* found that the plaintiff's negligent maintenance of a breasting dolphin proximately contributed to its claim for damages. *See id.* at 1356. However, the court further recognized that the presumption of fault against a vessel that strikes a moving object is inapplicable when the stationary object is a "marine structure, the function and design which is to buffer the impact of a docking vessel." *Id.* at 1357 (citation omitted).

The facts of this case are more akin to that in *Georgia Ports Authority v. The Atlantic Towing Co., Compania Anonima Venezolana De Navegacion*, Case No. CV482–79, 1983 WL 905 (S.D.Ga. May 20, 1983). There, the court found that the plaintiff's fender system's disrepair was open and obvious and, thus, the plaintiff did not breach its wharfinger duty of care. *Id.* at *9. The court relied on *Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co.*, 199 F.2d 761 (5th Cir. 1952), in which the Fifth Circuit stated:

> When, as the record shows to be the case here, the conditions claimed to be unlawful or negligent are entirely passive and have existed for many years to the knowledge of the moving vessel; when, too, the evidence is, as here uncontradicted that, while these conditions to [sic] tend to make the passage more difficult than if they did not exist, a

---

13. No arguments have been presented that either of the two tugs involved in the allision was at fault and there is no evidence to the contrary.

passage can be safely made under the conditions if due care is exercised; there is no basis in the record even for a division of the damages in favor of the actively negligent moving vessel, much less for awarding it full damage....

*Georgia Ports Authority,* 1983 WL 905, at *9.

■■■ Defendants were aware of the deteriorating condition of the Pier as well as its lack of fendering. Further, the evidence does not support a finding that had the Pier been in better condition, the allision would not have occurred. Thus, TPA did not breach its wharfinger duty of care and is not comparatively negligent.[14]

### E. Allocation of Fault

■■■■ Where two or more parties are at fault in causing property damages in a maritime collision, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault. Liability may be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault. *United States v. Reliable Transfer,* 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The only two parties at fault in the allision are the compulsory pilot, Lambert Ware, and the DUCHESS in rem. Assuming the *Reliable Transfer* rule applies in a situation of imputed negligence (and the parties have not argued otherwise), each is responsible for fifty percent (50%) of the damage caused by the allision.

### F. Measure of Damages

Plaintiff TPA contends that it is entitled to the costs of repairs plus twenty percent as well as attorney fees pursuant to its tariff and regulations. Westchester contends that it stands in the shoes of TPA as

subrogee and, therefore, is entitled to the same relief.

The relevant provisions of TPA's tariff and regulations state:

All vessels, their owners, charterers and their agents, and all other users of the facilities of the Tampa Port Authority further covenant and agree to indemnify and hold the Tampa Port Authority harmless from any loss, cost or expenses whatsoever directly or indirectly resulting or occasioned to, or imposed upon the Tampa Port Authority ... (2) by damage to or destruction of any Tampa Port Authority facility or any part thereof, ... caused by or attributable to the negligent acts or acts or an omission or omissions of vessels, their owners, charterers and their agents, and all other users of the Port facilities.

They further provide:

Obligations of the vessels, their owners, charterers and their agents and all other users of the facilities of the Tampa Port Authority under this subparagraph shall not only cover the losses and damages assessed or incurred but also such costs and expenses as those entailed in preparation for litigation or in settling or disposing of threats of litigation, including such items as fees of attorneys, parties (and their representatives) and witnesses; the employment of expert witnesses and the fees and charges paid to them; court costs and all of such costs and expenses incurred in preparation for trial, and the trial of the case or cases, and the appeal or appeals thereof, including the printing of Briefs and Records.

The expense of replacement or repair will be billed against the user (or users

---

**14.** The case of *Complaint of Wasson,* 495 F.2d 571 (7th Cir.1974) cited by defendant Ware is also unpersuasive. In that case, liability arose under the *Pennsylvania* rule due to the bridge owner's failure to keep the bridge in compliance with permit requirements. *Id.* at 579–82. No evidence was introduced in this case that the REK Pier was in violation of any permit requirement or statutory duty of care.

jointly) for such damage as herein stated as costs plus twenty percent (20%). (JX 126, 127).

Defendants contend: 1) plaintiffs did not adequately plead a claim for an additional twenty percent of the cost of repair and attorney fees under the tariff and regulations; 2) defendants did not have actual or constructive notice of the tariff and regulations; and 3) the provisions in the tariff and regulations substantially conflict with established principles of federal admiralty law.

### 1. Waiver Argument
#### a. Plaintiffs' Failure to Specifically Plead

TPA and Westchester argue that, despite defendants' contentions, defendants had adequate notice of plaintiffs' intention to claim these damages and fees. TPA contends that it was not required to specifically refer to the tariff and regulations in its amended complaint to put defendants on notice. Moreover, TPA claims that defendants were put on notice prior to the commencement of this litigation because on December 28, 1992 TPA sent a letter to Captain Custin, the Master of the M/V Duchess, which stated that the TPA regulations would apply to the property damage caused by the allision. (JX 21) Further, TPA and Westchester point out that the issues regarding the applicability of the tariff and regulations were raised in the pretrial stipulation submitted in May 1996.

Pursuant to its amended complaint filed November 8, 1994, TPA alleged that it was entitled to damages plus interest, prejudgment interest, costs, and attorney fees. (Dkt.12, p. 5) TPA specifically alleged damages, including lost revenue, amounting to $737,719.62. (Dkt.12, p. 3) Westchester, in its intervening complaint filed November 9, 1994, alleged damages plus interest, prejudgment interest, costs and attorney fees. (Dkt.13, p. 6) Neither the amended complaint nor the intervening complaint specifically referred to TPA's tariff and regulations.

In the pretrial stipulation filed May 10, 1996, both TPA and Westchester sought as elements of damages repair costs plus twenty percent as well as attorney fees. (Dkt.48, p. 8) Among the issues of law that remained to be determined were the applicability of the TPA regulations and tariff in determining damages as well as plaintiffs' entitlement to attorney fees. (Dkt.48, p. 12)

While TPA did not specifically cite to the authority under which it was seeking damages and attorney fees, in late December 1992, defendants BT Straits and M/V Duchess were on notice of TPA's claim that the regulations and tariff provided for damages and attorney fees. Furthermore, these issues were in the pretrial stipulation filed five months prior to trial. Moreover, TPA is not attempting to bring a separate claim for violation or breach of the tariff and regulations. Instead, TPA and Westchester merely allege that the tariff and regulations are the source for calculation of plaintiffs' damages.

 None of the defendants have shown that they have suffered any prejudice by the inclusion of these issues. All of the parties have filed extensive briefs on the issues. Therefore, defendants had adequate notice of plaintiff's intent to rely on the tariff provisions to establish damages.

#### b. Notice Argument

Defendants also contend that they did not have actual or constructive notice of TPA's tariff and regulations. TPA and Westchester respond that defendants had constructive notice of the tariff because the provisions at issue were required by law to be included in the tariff and filed before the Federal Maritime Commission (F.C.).

Title 46, United States Code Appendix, section 816 provides:

> every other person subject to this chapter shall establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering or property. . . .

 Under the Shipping Act, a tariff is

> a publication containing the actual rates, charges, classifications, Tariff Rules, regulations and practices of a common carrier, conference of common carriers, or marine terminal operator. The term "practices" refers to those usages, customs or modes of operation which in any way affect, determine or change the transportation rates, charges or services provided by a common carrier or marine terminal operator, and, in the case of conferences, must be restricted to activities authorized by the basic conference agreement.

46 C.F.R. § 514.2. The filing of a tariff before the F.C. gives the public constructive notice of only those terms required to be filed by law. *Port of Tacoma v. SS Duval,* 364 F.2d 615, 617 (9th Cir.1966); *New Zealand Kiwifruit Marketing Bd. v. City of Wilmington,* 806 F.Supp. 501, 503 (D.Del.1992). However, not all provisions of a tariff are required to be filed; for instance, limitations on liability provisions are not required to be filed. *Port of Tacoma,* 364 F.2d at 617. Additionally, the mere filing of a tariff before the F.C. does not constitute approval. *Maryland Port Admin. v. SS American Legend,* 453 F.Supp. 584, 592 (D.C.Md.1978).

 While TPA and Westchester contend that the provision regarding damages and attorney fees contained in the tariff constitute "charges" and were therefore required to be filed with the F.C. pursuant to 46 U.S.C.App. § 817, they have not cited this court to any authority supporting their position. This court is not persuaded that the damages and attorney fees provisions contained in TPA's tariff are the equivalent of "charges" under the Shipping Act. The provisions regarding attorney fees and damages were not required by federal law to be filed and, as such, defendants did not have constructive notice of the tariff provisions.

Neither TPA nor Westchester established that defendants had actual notice of the tariff prior to the December 1992 allision. Because plaintiffs have not shown that defendants had either constructive or actual notice of the tariff, the tariff and its provisions are not applicable and do not control the issue of damages in this case.

However, TPA and Westchester also argue that TPA's regulations, which contain the same provisions regarding damages and attorney fees, constitute state statutory law and, thus, defendants' ignorance of the law is no excuse.

The Hillsborough County Port District (HCPD) and Tampa Port Authority were established pursuant to Fla.Law Chap. 84–447. TPA is an independent special district as defined by Fla.Stat. § 189.403. *See Hillsborough County v. Tampa Port Authority,* 563 So.2d 1108, 1109 (Fla. 2d DCA 1990). Plaintiffs argue that TPA's regulations were promulgated pursuant to the authority granted in Fla.Law Chap. 84–447.

"[A]gency rules and regulations, duly promulgated under the authority of law, have the effect of law." *State v. Jenkins,* 469 So.2d 733, 734 (Fla.1985) (citation omitted). Nonetheless, it is undisputed that TPA's regulations are not codified in the Florida statutes. While the cases cited by plaintiffs have upheld certain acts taken by administrative bodies such as port authorities, *see Jacksonville Port Authority v. Alamo Rent–A–Car,* 600 So.2d 1159 (Fla. 1st DCA 1992), *Petchem, Inc. v. Canaveral Port Authority,* 483 So.2d 527 (Fla. 5th DCA 1986), *Tampa Port Authority v. Deen,* 179 So.2d 416 (Fla. 2d DCA 1965), *Clark v. Kreidt,* 145 Fla. 1, 199 So. 333 (1940), none of these courts found that regulations promulgated by an administrative body constitute state statutory law.

Even assuming arguendo that the TPA regulations constitute or are the equivalent of state statutory law, the regulations are still subject to preemption as discussed below.

### c. Preemption Argument

Defendants contend that the provisions regarding attorney fees and damages con-

tradict federal admiralty law and therefore are preempted. TPA and Westchester state that the regulations are not subject to preemption because the regulations do not contradict federal admiralty law and, further, involve matters of purely local concern.[15] *See, e.g., Pacific Merchant Shipping Ass'n v. Aubry,* 918 F.2d 1409, 1422 (9th Cir.1990), *cert. denied,* 504 U.S. 979, 112 S.Ct. 2956, 119 L.Ed.2d 578 (1992) ("the general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not actually conflict with federal law....").

■ The general rule is that the prevailing party's attorney fees are not recoverable in admiralty cases. *Noritake Co., Inc. v. M/V Hellenic Champion,* 627 F.2d 724, 730 (5th Cir.1980). The exceptions to this rule are: 1) when there is statutory authority providing for attorney fees; and 2) when the non-prevailing party has acted in bad faith. *See id.* at 730–71, n. 5.

TPA and Westchester stipulate that they are not attempting to seek fees under the bad faith exception. Instead, they contend that the TPA regulations providing for attorney fees fall within the statutory authority exception to the general rule.

■ In determining whether state law may be used in conjunction with federal law, the court must determine: 1) if the state law conflicts with substantive maritime law; and 2) if the state law affects remedies peculiar to the maritime jurisdiction. *Garan v. M/V Aivik,* 907 F.Supp. 397, 399 (S.D.Fla.1995). If the answer to either one of the foregoing is in the affirmative, the state law conflicts with federal law and is not applicable. *Id.*

In *Garan,* the court found that the offer of judgment statute (Fla.Stat. § 768.79) conflicts with the American Rule whereby

the parties are responsible for paying their own fees because "the Florida substantive rule impermissibly imposes an additional obligation on the parties in direct conflict with long-standing federal maritime common law." *Garan,* 907 F.Supp. at 400. The court further rejected use of Florida law as a supplement to federal maritime law because "such applications are only valid when federal statutory or common law is silent on the issue" and "[t]he federal law regarding the award of attorney's fees in the maritime context is clear and directs each side to pay its own fees." *Id.* (citation omitted). *See Also Sosebee v. Rath,* 893 F.2d 54, 57 (3d Cir.1990) (Virgin Islands statute providing for attorney fees directly conflicted with federal maritime law).

The *Garan* court further rejected the defendant's reliance on *Steelmet, Inc. v. Caribe Towing Corp.,* 842 F.2d 1237 (11th Cir.1988), as well as *Blasser Brothers, Inc. v. Northern Pan–American Line,* 628 F.2d 376 (5th Cir.1980), and explained that

> [i]n both of those cases, attorneys' fees were awarded only in third party actions on insurance contracts between insured shippers and their insurers. There, the Courts had previously recognized the ability of states to regulate rights under insurance policies issued within their domain.

*Garan,* 907 F.Supp. at 400–01.

TPA and Westchester similarly rely on *Steelmet* as well as *Windward Traders. Ltd. v. Fred S. James & Co. of N.Y., Inc.,* 855 F.2d 814 (11th Cir.1988), and *Hanson v. Veterans Admin.,* 800 F.2d 1381 (5th Cir.1986), all which upheld the awards of attorney fees in maritime actions. However, all of these cases involved maritime insurance actions. Therefore, for the same reasons stated in the *Garan* case, TPA and Westchester's reliance on these cases is misplaced.

---

**15.** Plaintiffs also argue that the provisions in TPA's tariff cannot be preempted because the tariff constitutes federal admiralty law. Plaintiffs fail to support this argument with any citations of authority. Moreover, this ar-gument is moot in light of this court's finding that the tariff is inapplicable due to inadequate notice. In any event, plaintiffs' argument is rejected.

As for plaintiffs' argument regarding local concern, similar issues were addressed in both *Garan* and *Sosebee*. Both court found that there is a "strong interest in maintaining uniformity in maritime law." *Garan*, 907 F.Supp. at 401; *Sosebee*, 893 F.2d at 56. Moreover, regardless of whether there is an issue of local concern, state law cannot displace conflicting federal law. *See Pacific Merchant*, 918 F.2d at 1409.

■ Accordingly, this court finds that the provision regarding attorney fees contained in TPA's regulations conflicts with preexisting federal admiralty law and therefore is preempted by federal admiralty law.

Defendants also object to the application of TPA regulations with regard to recovery of repair costs and state the regulations contradict federal admiralty law, specifically, the doctrines of comparative fault and betterment and depreciation.

■ Damages in a maritime case are governed by federal law. *Pelican Marine Carriers, Inc. v. City of Tampa*, 791 F.Supp. 845, 856 (M.D.Fla.1992), *aff'd*, 4 F.3d 999 (11th Cir.1993). "The purpose of compensatory damages is to place the injured party as nearly as possible in the condition he would have occupied if the wrong had not occurred." *Id.* at 856 (citation omitted). *See also Petition of M/V Elaine Jones*, 480 F.2d 11 (5th Cir.1973), *amended by Canal Barge Co., Inc. v. Griffith*, 513 F.2d 911 (5th Cir.1975), *cert. denied*, 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1975) ("A party suffering injury to his property is entitled to no more than restoration to its condition prior to the wrong.").

■ In cases where there is a constructive total loss[16] or actual total loss,[17] "the measure of damages is generally the market value of the property just before the loss (less the value of any salved equipment or materials) and does not include loss of use or other consequential damages." *Pillsbury Company v. Midland Enterprises, Inc.*, 715 F.Supp. 738, 763 (E.D.La.1989), *aff'd and remanded*, 904 F.2d 317 (5th Cir.1990), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990) (footnotes omitted); *see also Orange Beach Water, Sewer and Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1383 (11th Cir.1982) ("Where a structure is totally lost in an allision, the measure of damages is the market value at the time of destruction, less salvage value.") (citations omitted). If the repair or replacement of the damaged structure adds new value to or extends the useful life of the property, the court should reduce the full repair or replacement costs. *Pillsbury*, 715 F.Supp. at 763. In making the reduction,

> the Court must typically determine what the expected useful life of the property was just prior to the casualty, what the expected useful life of the repaired or replaced property would be, and what amount should be reduced from an award in order to account for any prior depreciation or any anticipated betterment. While a linear, or straight line, depreciation method is most commonly used for property with a fixed life span, this method is not to be applied where evidence establishes that the original property had been deteriorating at a nonlinear rate. Similarly, if there is no evidence of any deterioration prior to the casualty, then no deduction is made for depreciation.

*Id.* (footnotes omitted). The calculation is as follows:

> [The percentage of useful life extension] is the portion of the total useful life of the repaired property that the useful life extension constitutes. The allocable

16. A constructive total loss is when the costs of repairs exceeds the precasualty value of the property. *See Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F.Supp. 738, 763 (E.D.La. 1989), *aff'd and remanded*, 904 F.2d 317 (5th Cir.1990), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990).

17. Actual total loss is when the property is damaged beyond physical repair. *See Pillsbury*, 715 F.Supp. at 763.

cost of the useful life extension may then be derived by multiplying this percentage by the total repair expenses. If this allocable cost is then deducted from the total cost of repairs, the resulting damages award will precisely compensate the plaintiff for the cost of restoring his property to its preallision condition.

*Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 306 (5th Cir.1976) (footnote omitted).

■■■■ If, however, the expected useful life of the property is the same after the repair or replacement of the property, a straight-line depreciation formula should be used. *Id.* at 305. Further, if the repair or replacement does not extend the useful life, then no depreciation should be deducted. *Id.*

■■ Prior to reducing plaintiff's recovery by a percentage of depreciation, the court must first indicate the expected useful life of the repaired property. *Freeport,* 526 F.2d at 305 (citations omitted). Further, the court can also apply depreciation to both engineering fees and surveying costs. *See In re The Complaint of M & M Towing Co.,* Case Nos. 94–3264, 95–1406, 1997 WL 96377, *2 (E.D.La. March 4, 1997) (citation omitted).

As for any betterment, it must be proven in order for its value to be offset. *Freeport Sulphur Co. v. S/S Hermosa,* 526 F.2d 300, 304 n. 6 (5th Cir.1976) (citation omitted); *see generally Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 505 (5th Cir.1994) (trial court did not error in failing to include betterment reduction for deeper pipeline where record did not contain any evidence of value nor was issue raised by the court).

■■ Plaintiffs argue that the TPA regulations do not conflict with the doctrine of *restitutio in integrum* because both provide for the costs of repairs.[18] However, plaintiffs fail to address the fact that the regulations dictate recovery of the costs of repair (presumably the amount paid by TPA) but also provide for an additional twenty percent (20%) of the cost of repair. These rules are contrary to well-established principles of admiralty law providing only for compensatory damages and no unjust enrichment to the injured party.

### G. Amount of Damages

The most reasonable estimate of the cost to repair the REK Pier to restore it to the condition it was in prior to the DUCHESS allision is provided by the testimony of Charles Harden who estimated the damage would cost $145,000 to repair.

The other estimates of the cost of repair were predicated on the assumption that the outer 90–foot section of the Pier was so damaged by the DUCHESS allision alone that demolition and reconstruction of the outer section was required. This assumption is not supported by the preponderance of credible evidence. Rather, it is apparent that the fender renovation project was simply a "band-aid approach" to a seriously deteriorated structure. When the DUCHESS struck the northwest corner of the REK Pier on December 25, 1992 it provided plaintiff with an opportunity to re-do the work in progress and implement a design which would extend the useful life of the Pier another fifty years.[19] To award plaintiff the sum it paid Durocher for the additional work ($522,759)—or the cost of repair paid by its insurer ($390,355)—would be an undeserved windfall under the circumstances presented. Even Gary Dupere of Gee and Jensen conceded that the original pier design might be salvaged with the addition of more pile caps.[20]

18. *Restitutio in integrum* means "[r]estoration to the previous condition." *Crounse Corp. v. Vulcan Materials Co.,* 956 F.Supp. 1377, 1380 (W.D.Tenn.1996) (citation omitted).

19. Gary Dupere of Gee and Jensen testified that the Pier redesign after the DUCHESS allision would have given the Pier a useful life of about fifty years. (T2 at p. 124–26). He was unable to estimate what the useful life of the Pier would have been in the absence of the post-allision repairs but agreed that it would have been much shorter.

20. It is noteworthy that Dupere estimated that the redesign work he recommended—

Harden's estimate of $145,000 to repair the damage caused by the DUCHESS did not include a deduction for useful life. (T4, p. 31–33) Because the repairs estimated by Harden would have restored the Pier to the same condition, to the extent practicable, as it was prior to the DUCHESS allision, it is unnecessary for this court to apply a deduction for depreciation.[21] Further, as there was no evidence presented regarding betterment (and Harden's estimate did not take that into consideration), no deduction shall be made for this allowance.

Plaintiff is also entitled to recover its expenses of $5,922 for the Gee and Jensen damage report as well as the $720 diver bill. Together with these expenses, the total amount owed plaintiff (apart from prejudgment interest) is the sum of $151,642. The other costs claimed by plaintiff have not been established as necessarily related to the DUCHESS allision and the damage it caused.

### H. Damages of Subrogee Westchester Fire Insurance Company

Westchester's claim is dependent on that of its insured, plaintiff TPA. Any recovery against defendants must be allocated in accordance with the terms of the insurance contract.

### I. Prejudgment Interest

 The general rule in admiralty is that the court should award prejudgment interest absent peculiar circumstances. See e.g. Pelican Marine Carriers, Inc., v. City of Tampa, 791 F.Supp. 845, 857 (M.D.Fla.1992), aff'd, 4 F.3d 999 (11th Cir. 1993). Because Tampa Port Authority was without fault in the allision, it is entitled to prejudgment interest.

### Conclusion

For the reasons stated above, plaintiff Tampa Port Authority, or its subrogee, Westchester Fire Insurance Company,

shall recover $151,642, plus prejudgment interest, on its claim of negligence. The negligence claim against defendant B.T. Straits is dismissed.

B.T. Strait's Request For Oral Argument (Dkt.145) is DENIED.

Within ten (10) days, the parties shall file a proposed form of judgment consistent with the findings and conclusions stated herein, including an appropriate prejudgment interest rate.

Jurisdiction is reserved to consider other post-judgment motions for relief upon proper and timely application.

---

rebuilding the entire outer 90 feet of the Pier—would cost approximately $214,655.

21. In any event, the parties did not present any evidence at trial to permit consideration of this concept.